[No. B063569. Second Dist., Div. Six. June 15, 1993.]

PLANNED PARENTHOOD OF SANTA BARBARA, VENTURA AND SAN LUIS OBISPO, INC., et al., Plaintiffs and Appellants, v. CITY OF SANTA MARIA et al., Defendants and Appellants.

## Counsel

McCutchen, Doyle, Brown & Enersen, Beth H. Parker, Caroline D. Avery, Hannah Beth Jackson, Celeste Lacy Davis, Roger K. Evans, Hadsell & Stormer and Dan Stormer for Plaintiffs and Appellants.

Arther R. Montandon, City Attorney, Adams, Duque & Hazeltine, Richard R. Terzian and Remy Kessler for Defendants and Appellants.

## Opinion

**YEGAN, J.**—Here, we hold that a governmental entity and its agents may not offer a grant of public funds on condition that the recipient waive the constitutional right to privacy. We thus agree with the trial court which found that defendants, City of Santa Maria (City), its mayor, and city council, could not impose a grant restriction that conditioned the receipt of public funds upon the recipient's agreement not to provide abortion services. (*Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 284-285 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118].) We also hold that where, as here, the origin of the controversy is an attempt to obtain money, as opposed to vindicating a constitutional right, the trial court does not abuse its discretion as a matter of law in denying private attorney general attorney fees.

Planned Parenthood of Santa Barbara, Ventura and San Luis Obispo, Inc. and Jane Doe (Planned Parenthood) appeal from a summary judgment contending that the trial court should have ordered a turnover of $60,000 in grant funds and awarded private attorney general fees. (Code Civ. Proc., § 1021.5.) Defendants, in their cross-appeal, contend that they were authorized under federal law to make the grant subject to the "no-abortions" condition. We affirm the judgment in its entirety.

Planned Parenthood, a private nonprofit corporation, operates a clinic in Santa Maria and provides reproductive, health care, and family planning services to indigent women. Patients seeking abortion services are referred to San Luis Obispo and Santa Barbara because the Santa Maria clinic lacks the necessary facilities to perform abortions.

In 1990 Planned Parenthood decided to construct a new clinic. On April 2, 1990, it submitted a $60,000 grant proposal to the City based on a Community Development Block Grant (CDBG) program to renew and rehabilitate urban areas under title 1 of the Housing and Community Development Act of 1974. (42 U.S.C. § 5301 et seq.) In the proposal, Planned Parenthood listed a variety of services it would be performing at the new clinic. Abortion services were not listed. Under the CDBG program, City received funds from the United States Department of Housing and Urban Development (HUD) and subgranted the funds to qualified organizations and individuals.

On May 15, 1990, defendants approved Planned Parenthood's grant application on condition that no abortions be performed at the new clinic. Planned Parenthood lodged a protest but was advised that the funds would be reallocated if it failed to accept the CDBG grant as conditioned. On November 15, 1990, it filed a complaint for declaratory and injunctive relief, private attorney general fees, and costs. The complaint prayed for an order declaring the grant condition to be unconstitutional and enjoining "defendants from imposing and enforcing abortion-related restrictions on the award of CDBG funds to Planned Parenthood."

Defendants had the action removed to the United States District Court (28 U.S.C. § 1441) and filed a third party complaint against HUD for indemnity, declaratory and injunctive relief. The district court remanded the action because it presented no federal questions. HUD thereafter removed the action to federal court and the district court dismissed the third party complaint. In doing so, it ruled "we don't have any preemption question here. . . . If this no-abortion condition had been required by that federal law, we might have a different situation, but the condition attached by the City is not affirmatively required by the federal statute. It was imposed by a decision of the City Council and no one else."

Upon remand to the superior court, Planned Parenthood brought a motion for summary judgment and summary adjudication of issues. Defendants opposed the motion based on the assertion that federal law prohibited the distribution of federal money to abortion-related projects. In a well-written and well-reasoned opinion, the trial court found that the grant restriction violated the California Constitution and was contrary to the California Supreme Court opinion in *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d 252, 284-285. The trial court opinion stated, in pertinent part, that "[t]he relief sought by plaintiffs will not result in an order that would require the City to disburse the grant money without the condition: Plaintiffs are simply seeking a declaration that the condition violates California law and an injunction against imposition of the condition. As

defendants themselves point out, no written contract has yet been entered into for the disbursement of the CD Block Grant funds. Thus, it is not necessary to resolve in the present action questions such as whether or not Planned Parenthood made any misrepresentations in its grant application. . . ."

## Planned Parenthood Appeal

■ Because an appeal from a summary judgment raises only questions of law, we must independently analyze the supporting and opposing papers to determine whether there is a triable issue as to any material fact. (Code Civ. Proc., § 437c, subd. (c); *AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) In doing so, we apply the same analysis required of the trial court. "First, we identify the issues framed by the pleadings . . . . [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. . . . [¶] [T]he third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citations.]" (*Id.* at pp. 1064-1065; see also *Visueta* v. *General Motors Corp.* (1991) 234 Cal.App.3d 1609, 1613 [286 Cal.Rptr. 402].)

■ Planned Parenthood contends that the trial court erred by not ordering defendants to "turn over" the $60,000. Not so. The issue was not pled in the complaint or addressed in the summary judgment motion or the separate statement of undisputed facts. (Code Civ. Proc., § 437c, subd. (b); *United Community Church* v. *Garcin* (1991) 231 Cal.App.3d 327, 337 [282 Cal.Rptr. 368].) Planned Parenthood's reply papers conceded that the motion was limited to the relief prayed for in the complaint: "Should defendants . . . refuse to conclude the grant award process, . . . plaintiff would seek further relief from the courts." No evidence was presented that Planned Parenthood had a vested entitlement to the grant money.[1]

We reject the argument that the trial court should have taken the extra step and ordered a turnover of the funds. Planned Parenthood could not use a motion for summary judgment to expand the scope of the complaint. (*Keniston* v. *American Nat. Ins. Co.* (1973) 31 Cal.App.3d 803, 812 [107 Cal.Rptr. 583]; *Dorado* v. *Knudsen Corp.* (1980) 103 Cal.App.3d 605, 611 [163 Cal.Rptr. 477].) This is so because the pleadings defined the issues for

---

[1]HUD regulations state that "[b]efore disbursing any CDBG funds to a subrecipient, the recipient shall sign a written agreement with the subrecipient." (24 C.F.R. § 570.503(a) (1992).) Assuming the parties sign a HUD contract, the funds may not be disbursed until Planned Parenthood shows that "all laborers and mechanics" who worked on the project were paid prevailing wages. (24 C.F.R. § 570.603 (1992).)

summary judgment and summary adjudication. (*Metromedia, Inc.* v. *City of San Diego* (1980) 26 Cal.3d 848, 885 [164 Cal.Rptr. 510, 610 P.2d 407]; *Hejmadi* v. *AMFAC, Inc.* (1988) 202 Cal.App.3d 525, 536-537 [249 Cal.Rptr. 5].)

█ Planned Parenthood further claims that the trial court erred by not awarding private attorney general fees. (Code Civ. Proc., § 1021.5.)[2]

The trial court expressly found that the action was brought in furtherance of Planned Parenthood's financial interests, i.e. ". . . it has a stake in the outcome. It has a $60,000 stake, a substantial interest." Planned Parenthood was instructed to re-address the issue of attorney fees in a postjudgment motion. It elected not to do so, and instead, filed the instant appeal.

█ The order may not be disturbed on appeal absent a showing the trial court abused its discretion as a matter of law. (*Weissman* v. *Los Angeles County Employees Retirement Assn.* (1989) 211 Cal.App.3d 40, 46-47 [259 Cal.Rptr. 124].) "In this case, the trial court had to evaluate whether plaintiffs' action: (1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter. [Citations.]" (*Baggett* v. *Gates* (1982) 32 Cal.3d 128, 142 [185 Cal.Rptr. 232, 649 P.2d 874].)

█ Here, the action invalidated a grant restriction affecting the terms of the construction loan and private use of the clinic. There is no doubt that the controversy touched upon the constitutional right of privacy. However, the interests of the clinic patients and general public were incidental to Planned Parenthood's primary objective of obtaining grant money. (*Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 166-167 [188 Cal.Rptr. 104, 655 P.2d 306]; *Angelheart* v. *City of Burbank* (1991) 232 Cal.App.3d 460, 468-469 [285 Cal.Rptr. 463].) No evidence was presented that the litigation transcended Planned Parenthood's financial interests and imposed a financial burden disproportionate to its individual stake in the matter. (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 941 [154 Cal.Rptr. 503, 593 P.2d 200].)

---

[2]Code of Civil Procedure section 1021.5 states: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

Planned Parenthood now asserts that its litigation costs "far outstrips the $60,000 grant Planned Parenthood may one day get." That, however, is a financial risk inherent in any litigation where Code of Civil Procedure section 1021.5 fees are sought. Planned Parenthood has not demonstrated as a matter of law that an award of private attorney general fees is appropriate. Based on the evidence presented, the trial court reasonably concluded that Planned Parenthood was furthering its own economic interests and that the lawsuit conferred no significant benefit to the general public. ■ "Section 1021.5 was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest. [Citations.]" (*Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106, 114 [212 Cal.Rptr. 485].)

■ Nothing in our recent opinion in *Planned Parenthood* v. *Aakhus* (1993) 14 Cal.App.4th 162 [17 Cal.Rptr.2d 510], compels an award of fees here. There, Planned Parenthood was directly protecting the constitutional right of privacy. It had to, on its own, seek and obtain a state court injunction prohibiting trespass at its Santa Barbara clinic. The district attorney refused to enforce a previously obtained federal injunction. (*Id.* at p. 167.)

Here, by contrast, Planned Parenthood was not directly seeking to protect the constitutional right of privacy. It was seeking money and was but one of several grant applicants for a limited amount of public funds.

The request for private attorney general fees should have been addressed in the postjudgment motion invited by the trial court. Code of Civil Procedure section 1021.5 contemplates a written motion which can be made postjudgment. (*Stebbins* v. *Gonzales* (1992) 3 Cal.App.4th 1138, 1146 [5 Cal.Rptr.2d 88]; *Marini* v. *Municipal Court* (1979) 99 Cal.App.3d 829, 834 [160 Cal.Rptr. 465].) We construe Planned Parenthood's election not to bring the motion as a tactical decision that no stronger showing can be made. (See *Zilmer* v. *Carnation Co.* (1989) 215 Cal.App.3d 29, 35 [263 Cal.Rptr. 422] [refusal to amend complaint after demurrer sustained carries presumption that no stronger case can be stated].)

Just as we did in *Planned Parenthood* v. *Aakhus, supra,* we again uphold the trial court's discretionary ruling. We cannot say as a matter of law that the trial court abused its discretion in denying private attorney general fees and costs.

### Cross-appeal

■ Defendants, in their cross-appeal, argue that the abortion restriction was lawful because it involved the grant of federal money. We disagree. As

indicated, the grant was conditioned upon the waiver of a privacy right guaranteed by the California Constitution. (Cal. Const., art. I, § 1; *Chico Feminist Women's Health Center* v. *Scully* (1989) 208 Cal.App.3d 230, 241 [256 Cal.Rptr. 194].) *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d 252 is dispositive. There, our Supreme Court held that a state law limiting Medi-Cal funding for abortions violated the privacy and equal protection guarantees of the California Constitution. (*Id.* at pp. 284-285.) " '[T]he Legislature need not subsidize any of the costs associated with childbearing, or with health care generally . . . once it chooses to enter the constitutionally protected area of choice, it must do so with genuine indifference. It may not weight [*sic*] the options open to the pregnant woman by its allocation of public funds; in this area, government is not free to "achieve with carrots what [it] is forbidden to achieve with sticks." L. Tribe, American Constitutional Law, § 15-10 at p. 933 n. 77 (1978).' [Citation.]" (*Id.* at p. 285.)

The same principle applies here. When a city participates in a federal program that may benefit the members of the general public, it may not condition receipt of the funds upon the waiver of a state constitutional right. (*Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d at pp. 284-285.) The municipality has no plenary power to impose supplemental grant restrictions that discriminate against grant recipients. (E.g., *Planned Parenthood Ass'n of Utah* v. *Dandoy* (10th Cir. 1987) 810 F.2d 984, 988 [state law restricting title X family planning services for unmarried minors]; *King* v. *Smith* (1968) 392 U.S. 309, 333-334 [20 L.Ed.2d 1118, 1134-1135, 88 S.Ct. 2128] [state regulation denying Aid to Families With Dependent Children benefits to mother cohabitating with a man].) Federal preemption is not an issue. (*Jane Does* v. *State of Utah Dept. of Health* (10th Cir. 1985) 776 F.2d 253, 256.)

Defendants nonetheless contend that they were empowered to act on HUD's behalf and impose a "no abortions" condition. This argument stretches the fabric of federal preemption inside out and assumes that a municipality can define federal policy. Our concern is whether federal law required a "no-abortion" condition and was intended to preempt state laws. ■ We must determine whether "Congress has 'positively required by direct enactment' that state law be preempted" and whether the state law "do[es] 'major damage' to 'clear and substantial' federal interests . . . . [Citation.]" (*Hisquierdo* v. *Hisquierdo* (1979) 439 U.S. 572, 581 [59 L.Ed.2d 1, 11, 99 S.Ct. 802].) The party claiming federal preemption has the burden of proving it. (*Elsworth* v. *Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630].)

■ Defendants concede that the Housing and Community Development Act does not prohibit or mandate abortion-related conditions. Congress

merely required that the funds be used to alleviate "critical, social, economic and environmental problems" in cities and small urban communities. (42 U.S.C. §§ 5301(a), 5305(a)(8).) Nothing in the Housing and Community Development Act or its legislative history suggests that Congress intended to override a program administrator's obligation to treat grant requests in a nondiscriminatory fashion.

Defendants rely upon *Rust* v. *Sullivan* (1991) 500 U.S. 173 [114 L.Ed.2d 233, 111 S.Ct. 1759] (*Rust*) for the proposition that federal law in general permits restrictions on abortion-related activities where the abortion provider is receiving *federal* funds. Such reliance is misplaced.

*Rust* involved a federal regulation affecting family planning clinics receiving title X funds under the Public Health Service Act. (42 U.S.C. § 300 et seq.) The act authorized the Secretary of Health and Human Services to grant funds to nonprofit entities providing family planning services. Under section 1008 of the act, Congress provided that "[n]one of the funds appropriated *under this subchapter* shall be used in programs where abortion is a method of family planning." (42 U.S.C. § 300a-6, italics added.) In 1988 the Department of Health and Human Services promulgated new regulations prohibiting title X grantees from counseling, encouraging, or promoting abortion as a method of family planning. (42 C.F.R. §§ 59.2, 59.8, 59.9 and 59.10 (1992).) Title X grantees challenged the regulation on the ground it violated the federal rights of title X health care providers and patients. The Supreme Court upheld the regulation because Congress forbade the use of title X funds in programs where abortion was a method of family planning. (*Rust* v. *Sullivan*, *supra*, 500 U.S. at p. __ [114 L.Ed.2d at p. 254].)

*Rust* is distinguishable. The Housing and Community Development Act places no restrictions on the type of medical services that may be provided in a medical facility constructed with CDBG funds. Congress did not authorize HUD or state entities to place abortion-related restrictions on CDBG loans.[3] We therefore conclude that a municipality administering CDBG grants must do so in a nondiscriminatory manner and may not condition receipt of the funds upon the waiver of a state constitutional right. (*Committee to Defend Reproductive Rights* v. *Myers*, *supra*, 29 Cal.3d 252, 275.)

---

[3]HUD regulations provide that "CDBG assistance may not be used for religious activities or provided to primarily religious entities. . . ." (24 C.F.R. § 570.200(j) (1992).) Under the caption, "Ineligible activities," the regulations state that CDBG funds may not be used "for the general conduct of government," to finance "general government expenses," or for political activities. (24 C.F.R. § 570.207 (1992).)

The judgment is affirmed. The parties shall bear their own attorney fees and costs on appeal.

Stone (S. J.), P. J., and Gilbert, J., concurred.

A petition for a rehearing was denied July 13, 1993, and the opinion was modified to read as printed above.