[No. G027509. Fourth Dist., Div. Three. May 29, 2002.]

BARRY HAMMOND, Plaintiff and Respondent, v.
LARRY AGRAN, Defendant and Appellant.

116

**COUNSEL**

Kenneth D. Agran for Defendant and Appellant.

Wagner & Associates, Megan L. Wagner and Donald P. Wagner for Plaintiff and Respondent.

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

We now partially reverse the order of the trial court denying any fees at all under the private attorney general doctrine (Code Civ. Proc., § 1021.5)[1] to Larry Agran, the prevailing party in *Hammond v. Agran* (1999) 76 Cal.App.4th 1181 [90 Cal.Rptr.2d 876] (*Hammond I*). In doing so we come to the following conclusions:

(1) The trial court was correct in not awarding any fees based on Agran's trial work in *Hammond I*. As one seeking elective office, Agran had a specific, concrete and significant interest in the trial litigation, which involved a challenge to his candidate's statement for a voters pamphlet.

(2) The trial court was correct to the extent that it did not award fees for Agran's appellate work in *Hammond I* for work attributable (a) to the defense of that portion of his candidate's statement which was claimed to be factually misleading and (b) to his attempt to obtain fees under section 1021.5 just in case he won. Again, as a political candidate, he had specific, concrete and significant interest in defending the *veracity* of his candidate's statement: His personal credibility was at stake.

---

[1] All references in this opinion to section 1021.5 are to the Code of Civil Procedure. All statutory references to sections 13307 and 13313 are to the Elections Code.

(3) However, the trial court erred to the extent that it precluded fees for that portion of Agran's appellate work in *Hammond I* attributable to the important issue of the scope of section 13307, and specifically whether the word "qualifications" as used by that statute could include statements of a candidate's views or positions. In litigating the issue of the *scope* of section 13307, Agran transcended his personal interest and his efforts resulted in the enforcement of an important public right.

## II. BACKGROUND

Agran was running for a seat on the Irvine City Council. He submitted a candidate's statement for the voters pamphlet indicating that he was opposed to a commercial airport at the nearby El Toro Marine Base, and that during previous terms on the council, including six years as mayor, he had "led the Council in drafting Irvine's General Plan." Barry Hammond, a rival of Agran's in Irvine politics, challenged that statement, as provided for by section 13313. The statute allows any voter, within a specified time frame, to seek writ of mandate for amendment or deletion of material in a candidate's statement upon clear and convincing evidence that it is "false, misleading, or inconsistent with" the pertinent requirements of the Elections Code.

Hammond's challenge was twofold. First, he maintained that Agran's claim to have "led" the Irvine City Council in developing the city's general plan was factually false or misleading. Second, he argued that the articulation of Agran's opposition to the airport was "inconsistent" with the pertinent requirements of the Elections Code, specifically section 13307, which authorizes candidate statements to include, "a brief description, of no more than 200 words, of the candidate's education and qualifications expressed by the candidate himself or herself." Hammond contended that Agran's views on the airport were not within the scope of the word "qualifications" as set forth in section 13307, and therefore Agran's statement was "inconsistent" with requirements of the under section 13313.

Hammond prevailed in the trial court. The court deleted the middle paragraphs of the statement (the ones plainly expressing opposition to the airport) because the trial judge did not believe that campaign statements or platforms were within the proper ambit of the word "qualifications." The trial judge also had Agran modify his statement about leading the city council in developing the city's general plan.

Agran appealed from the order to this court. Meanwhile, he won a seat on the city council anyway.

The appeal resulted in a published decision, *Hammond I, supra,* 76 Cal.App.4th 1181, construing section 13307. The court specifically held that

the word "qualifications" *did* include a candidate's views on public issues. Indeed, almost all of the opinion was devoted to that issue. Only one paragraph was devoted to the question of the accuracy of the statement concerning Agran's leadership of the city council in developing the city's general plan. (See *Hammond I, supra*, 76 Cal.App.4th at p. 1193.)

Agran clearly wanted attorney fees for his efforts on appeal if he won. His opening brief totalled 66 pages. The first half addressed the merits. The second half was devoted entirely to a request for attorney fees under the private attorney general doctrine (§ 1021.5). (Only the final four pages of Agran's 37-page reply brief were devoted to his attorney fee request.)

As regards the attorney fee issue, this court opted to have the trial court determine whether, and if so how much, attorney fees should be awarded. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 426 [253 Cal.Rptr. 426, 764 P.2d 278] [it is "proper for a reviewing court to defer to the trial court" in making the "determination" of whether to award fees in the first instance].) We noted that the issue could be "problematic" given that no previous decision had ever considered the question of attorney fees under the private attorney general doctrine in the context of a challenge to a candidate's voters pamphlet statement. (*Hammond I, supra*, 76 Cal.App.4th at p. 1194.)

Agran filed a disqualification declaration against the original trial judge (see Code Civ. Proc., § 170.6) and the case was transferred to Judge William F. McDonald. Agran requested attorney fees and costs aggregately totaling $61,639.47, broken down as follows: for trial work in *Hammond I*, $6,912; for appellate work in *Hammond I*, $43,964.97; and for trial work on remand, $10,762.50.

Judge McDonald denied Agran's fee request in its entirety. It is clear from the reporter's transcript of the hearing that he concluded that one of the statutory elements necessary for any award of fees under section 1021.5 was missing, namely that "the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate." (See *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 934-935 [154 Cal.Rptr. 503, 593 P.2d 200] [breaking down statutory criteria into three constituent elements, of which the "necessity and financial burden" language is the third element].) Judge McDonald reasoned that Agran, as a candidate for city council in the 1998 election, had a "personal stake" that was "sufficient enough motivation to pursue the litigation without an award of attorney's fees." This appeal followed.

## III. Discussion

### A. *The Background of the "Necessity and Financial Burden" Problem in Section 1021.5 Jurisprudence*

As our high court explained in *Woodland Hills*, eligibility for a fee award under the private attorney general doctrine as codified in section 1021.5 requires three elements. (See *Woodland Hills Residents Assn., Inc. v. City Council, supra*, 23 Cal.3d at pp. 934-935.)

We have already mentioned the "necessity and financial burden" element, which is language lifted directly from the first paragraph of the statute. The other two are (1) that the plaintiffs' action has "resulted in the enforcement of an important right affecting the public interest" and (2) "a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons."

There can be no doubt that Agran's prior appeal, resulting in *Hammond I, supra*, 76 Cal.App.4th 1181, satisfied the latter two elements. The right of a candidate to express his or her views in a voter's pamphlet obviously affects the public interest in providing "the voters with information to aid them in making their choices at the ballot box." (See *Griset v. Fair Political Practices Com.* (1994) 8 Cal.4th 851, 862 [35 Cal.Rptr.2d 659, 884 P.2d 116].) Moreover, the dissemination of a candidate's views confers a benefit on the general voting public, many of whom often crave, particularly in local elections, information about what the candidate *thinks* and what he or she is likely to *do* in office, which is far more likely to be revealed by the candidate's positions on issues than his or her work experience.[2]

It is the third element which was the sticking point. Much of the case law bearing on the "necessity and financial burden of private enforcement" element has emerged from the land use context, where courts have been forced to distinguish a litigant's obvious personal financial interest based on property ownership from a broader or more transcendent public purpose. (E.g., *Woodland Hills Residents Assn., Inc. v. City Council, supra*, 23 Cal.3d

---

[2]With regard to the second element of conferring a significant benefit on a large class of persons or the general public, the trial judge remarked that the right to include views as part of one's qualifications under section 13307 only "tangentially" benefited the public, and "really accru[ed] more to the [benefit] of the candidates themselves." Au contraire. We dare to say that many, perhaps most voters, particularly in large urban and suburban communities where, unlike the proverbial small town, everybody doesn't know everybody else, are far more likely to be influenced by a candidate's positions on various issues (like local spending priorities) than whether he or she coached Little League. (*Hammond I, supra*, 76 Cal.App.4th at p. 1192.) The trial court was, however, still willing to assume that the second element had been satisfied.

917 [local landowners used environmental statutes to litigate against proposed development of nearby property]; *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158 [188 Cal.Rptr. 104, 655 P.2d 306] [coastal property owners challenged easement dedication requirements]; *Beach Colony II v. California Coastal Com.* (1985) 166 Cal.App.3d 106 [212 Cal.Rptr. 485] [landowners adjacent to lagoon challenged land use regulations regarding effects of encroaching lagoon waters]; *Williams v. San Francisco Bd. of Permit Appeals* (1999) 74 Cal.App.4th 961 [88 Cal.Rptr.2d 565] [landowner challenged development of neighboring lot]; *Christward Ministry v. County of San Diego* (1993) 13 Cal.App.4th 31 [16 Cal.Rptr.2d 435] [neighbor of public landfill challenged vertical and horizontal expansion of the landfill that would affect their ocean view]; *Terminal Plaza Corp. v. City and County of San Francisco* (1986) 177 Cal.App.3d 892 [223 Cal.Rptr. 379] [owner of residential hotel used environmental statutes to attack local anticonversion ordinance]; *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (2000) 79 Cal.App.4th 505 [94 Cal.Rptr.2d 205] [local residents brought action against proposed large development project in rural area].)

Even beyond the land use area, section 1021.5 puts courts to the often difficult task of divining a party's general economic incentive to litigate, as, for example, when the party seeks damages or other monetary relief. (E.g., *Satrap v. Pacific Gas & Electric Co.* (1996) 42 Cal.App.4th 72 [49 Cal.Rptr.2d 348] [no fees in wrongful termination, whistleblower context]; *Planned Parenthood v. City of Santa Maria* (1993) 16 Cal.App.4th 685 [20 Cal.Rptr.2d 391] [no fees because litigation sought wrongfully conditioned grant funds]; *Luck v. Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1 [267 Cal.Rptr. 618] [no fees in case based on wrongful termination arising out of refusal to be tested for drugs].)

Paradoxically, the less direct or concrete a personal interest someone has, the more likely he or she will satisfy the element and be eligible for fees under the statute. Thus, in practice, the necessity and financial burden element of section 1021.5 tends to be analyzed like golf is scored: the lower the better.

In the (non-land-use) case before us, the degree to which a "nonfinancial" or nonpecuniary interest might otherwise disqualify a litigant seeking attorney fees under section 1021.5 has commanded considerable attention from both parties (we are about to see why).[3] Agran asserts that *only* a "financial" interest could work to disqualify him from seeking fees, based essentially on

---

[3] The trial judge noticed it too, remarking at the "great lengths" the parties had gone "as to pecuniary benefits of holding office."

an observation in a footnote in *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311 [193 Cal.Rptr. 900, 667 P.2d 704] and Justice Sims's concurring and dissenting opinion in *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors, supra,* 79 Cal.App.4th 505.

A brief history of the financial-nonfinancial controversy as it has developed in the cases so far goes like this: First there was *Press,* which was a case where a group of activists sought to qualify an oil profits initiative measure, Proposition 11, for the 1980 ballot. The proponents of the initiative were trying to gather signatures in the area in front of a supermarket. The supermarket didn't like it and threatened them with arrest. They sought an injunction, won, and went on to obtain 3,000 signatures at the store. They then sought fees under section 1021.5. The trial court granted fees, but in an extremely low amount, and the activists appealed. In returning the case for a higher fee award, the Supreme Court observed, in a footnote pegged to a sentence concerning the necessity and financial burden prong, that section 1021.5 "focuses not on plaintiffs' abstract personal stake, but on the *financial* incentives and burdens related to bringing suit." (*Press Lucky Stores, Inc., supra,* 34 Cal.3d at p. 321, fn. 11, italics added.)

Next came *Williams v. San Francisco Bd. of Permit Appeals, supra,* 74 Cal.App.4th 961, which arose out of a landowner's attempt to prevent the Victorian structure next door from being replaced with a four-story apartment building. In denying fees, the court said that the kind of "personal interest" which might give someone an adequate incentive to litigate was not limited to "pecuniary or economic" interests. (*Id.* at p. 967.) Purely "aesthetic considerations" could also give a litigant a powerful enough individual stake to obviate the need for a fee award. (*Id.* at p. 968.) In the process, the *Williams* court took the position that the language in *Press* was essentially dicta, "not in any way central to the holding" of the case. (*Id.* at p. 970.)

Most recently, the issue was more sharply joined in *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors, supra,* 79 Cal.App.4th 505, where the panel divided on it. That case arose out of the efforts of a city, a conservancy group, and a group of people who lived in the general rural area, all of whom opposed a large upscale residential subdivision project. They sought fees for having obtained an appellate opinion holding that the project was inconsistent with the county's general plan and contravened several environmental laws. When the fee issue came before the court in a second appeal, the majority used the opportunity to elaborate on the problem of whether "aesthetic," as distinct from "pecuniary" interests, might serve to defeat a fee award request under section 1021.5. It turned out that one of the attorneys for the claimants had declared that none of the

claimants had any financial or economic interest in the outcome, and in fact opined that his own house would actually increase in value if the upscale development were built. (*Families Unafraid*, at pp. 518-519.)

The *Families Unafraid* majority said two things in that regard: (a) they agreed with *Williams* that interests beyond strictly financial ones *could* defeat a fee award, but (b) not just any old nonfinancial interest could defeat a fee award; the interest had to be "specific, concrete and significant" to defeat a fee award. (See *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors, supra*, 79 Cal.App.4th at pp. 514-516.) For the *Families Unafraid* majority "an aesthetic or environmental interest will *not* be considered sufficient to block an award of attorney fees" unless the interest is "specific, concrete and significant," as shown by objective evidence. (*Id.* at p. 516, italics added.) The majority reversed the trial court's decision not to award fees and sent the case for further consideration, including whether the cost of the litigation was "out of proportion to plaintiffs' nonfinancial interests in the litigation." (*Id.* at p. 522.)

Justice Sims, however, disagreed with the majority's "conclusion that the aesthetic interest of plaintiffs may serve to defeat an award of fees under Code of Civil Procedure section 1021.5." (*Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors, supra*, 79 Cal.App.4th at p. 523 (conc. & dis. opn. of Sims, J.).) He argued that the "necessity and financial burden" clause should be strictly confined to financial or pecuniary interests. (*Id.* at pp. 523-528.)

## B. *Nonfinancial Personal Interests Can Defeat an Award of Fees Under Section 1021.5*

### 1. *The Text Permits Nonpecuniary Considerations*

 Sometimes, when all else fails, one must actually read the statute.[4] (See *Greenwood v. United States* (1956) 350 U.S. 366, 374 [76 S.Ct. 410,

---

[4]Section 1021.5 is short enough to reproduce in full here: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor, unless one or more successful parties and one or more opposing parties are public entities, in which case no claim shall be required to be filed therefor under Part 3 (commencing with Section 900) of Division 3.6 of Title 1 of the Government Code.

414-415, 100 L.Ed. 412].) The operative language from section 1021.5 sets up as a requisite for a fee award "in any action which has resulted in the enforcement of an important right affecting the public interest" that the "necessity and financial burden of private enforcement . . . are such as to make the award appropriate."

Nothing in the text confines the consideration of the necessity and financial burden clause to just financial interests. True, the words "financial burden" certainly imply that a court should look at what the claimant hoped to gain financially from the litigation in comparison to what it cost. But it doesn't follow that a court must stop there. The addition of the word "necessity" suggests, lest it be redundant, that factors beyond just "financial burden" also may be looked at.

### 2. *The Case Law Permits Nonpecuniary Considerations*

*Woodland Hills,* decided in 1979, was our high court's first encounter with section 1021.5, enacted in 1977, and the court had every reason to focus on the elements of the statute for the benefit of lower courts in future litigation.[5] Thus it explicated the " 'necessity and financial burden' " clause to mean that the " 'cost of the claimant's legal victory transcends his *personal interest.*' " (*Woodland Hills Residents Assn., Inc. v. City Council, supra,* 23 Cal.3d at p. 941, quoting *County of Inyo v. City of Los Angeles* (1978) 78 Cal.App.3d 82, 89 [144 Cal.Rptr. 71], italics added.)

The words "personal interest," without qualification, however, pose a semantic problem. In a vacuum they cut a wide swath, perhaps too wide. It was that problem which our high court addressed in *Press.*

There, the plaintiffs were ideologically motivated (see *Press v. Lucky Stores, Inc., supra,* 34 Cal.3d at p. 316, fn. 2). As such, it could hardly be contended that they did not have a "personal interest" in the litigation in the broad sense that they were emotionally and intellectually connected to the litigation in ways that the general public was not. But it would have been ridiculous to disqualify them from a fee award because of their "interest." If

---

[¶] Attorneys' fees awarded to a public entity pursuant to this section shall not be increased or decreased by a multiplier based upon extrinsic circumstances, as discussed in Serrano v. Priest, 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303]."

[5]California had recognized the "private attorney general" concept as a common law doctrine. (See *Woodland Hills Residents Assn., Inc. v. City Council, supra,* 23 Cal.3d at pp. 930-932.) Then came the United States Supreme Court's decision in *Alyeska Pipeline Co. v. Wilderness Society* (1975) 421 U.S. 240 [95 S.Ct. 1612, 44 L.Ed.2d 141], which held that such fees should not be awarded absent *statutory* authorization. (*Id.* at p. 247 [95 S.Ct. at pp. 1616-1617].) Accordingly, the Legislature enacted section 1021.5 in 1977.

anyone should have gotten fees under section 1021.5, they should have—they were, after all, litigating over such fundamental issues as the right to petition government and speak freely. (See *Press*, at p. 320, fn. 7.)

So it was in that context that the *Press* court penned footnote 11, which juxtaposed "plaintiffs' *abstract* personal stake" with the "financial incentives and burdens related to bringing suit." (*Press v. Lucky Stores, Inc., supra*, 34 Cal.3d at p. 321, fn. 11, italics added.) That contrast makes perfect sense, because, surely, *abstract or ideological* personal interests were never intended by the Legislature to defeat fee claims under section 1021.5. As the court went on to recognize in the same footnote, you've got to have some sort of personal interest just to establish standing. (*Press*, at p. 321, fn. 11 ["the absence of some concrete personal interest" would mean a lack of standing].)

The lesson of the *Press* decision is that "personal interest" in the abstract *is* too broad a test to simplistically plug into the necessity and financial burden clause. But the *Press* court didn't say that nonpecuniary considerations were irrelevant. The operative word in the *Press* footnote is not "financial," but "focus." The *Press* court used the word twice (in the sentence to which it appended its footnote ("This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit") and in the footnote itself (the statute "focuses on . . . the financial incentives . . . .") (*Press v. Lucky Stores, Inc., supra*, 34 Cal.3d at p. 321).

Just because you have a photograph that is "focused" on the center point of a picture doesn't mean you arbitrarily refuse to look at the rest of the picture. There may be things off to the sides that are interesting as well.

It stands to reason that in considering a claim for fees under section 1021.5 a court will initially focus on the financial calculus. The first thing a court will want to know is what sort of financial stake the litigant had in the outcome. (See *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors, supra*, 79 Cal.App.4th at p. 514 ["the traditional focus of personal interest, then, is on financial interest"].) But that hardly precludes other considerations. It is reading too much into the *Press* footnote to say that it straightjackets consideration of section 1021.5 claims to just pecuniary considerations.

### 3. *The Central Concept Behind the Statute Permits Consideration of Nonpecuniary Factors*

As almost all courts have recognized in this area, the underlying idea behind the necessity and financial burden clause is disproportionality of the

claimant's stake in the litigation to the public result. (See generally *Woodland Hills Residents Assn., Inc. v. City Council, supra*, 23 Cal.3d at p. 941 [" 'when the necessity for pursuing the lawsuit placed a burden on the plaintiff "out of proportion to his individual stake in the matter" [citation]' "]; *Planned Parenthood v. City of Santa Maria, supra*, 16 Cal.App.4th at p. 691 ["No evidence was presented that the litigation . . . imposed a financial burden disproportionate to its individual stake"]; *Williams v. San Francisco Bd. of Permit Appeals, supra*, 74 Cal.App.4th at p. 967, quoting *Woodland Hills* above; *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors, supra*, 79 Cal.App.4th at p. 520 ["We remand for the trial court to consider whether the cost of the *Future I* appeal is out of proportion to plaintiffs' nonfinancial interests in the appeal."]; *Satrap v. Pacific Gas & Electric Co., supra*, 42 Cal.App.4th at p. 78 [trial court has discretion to deny fees "on the ground that the plaintiff's personal stake in the outcome was not disproportionate to the burden of private enforcement"].)

The word "transcend" also appears throughout the cases. The idea is that the litigation for which fees are claimed must *transcend* one's interests, whether pecuniary or not. (E.g., *Woodland Hills Residents Assn., Inc. v. City Council, supra*, 23 Cal.3d at p. 941 [fees are " 'appropriate when the cost of claimant's legal victory transcends his personal interest' "]; *Planned Parenthood v. City of Santa Maria, supra*, 16 Cal.App.4th at p. 691 ["No evidence was presented that the litigation transcended Planned Parenthood's financial interests . . . ."].)

The idea of transcendent disproportionality gives us an important insight into the purpose of the statute. The claimant's objective in the litigation must go beyond—"transcend"—those things that concretely, specifically and significantly affect the litigant (to borrow from the *Families Unafraid* court's well-chosen words in this regard, see *Families Unafraid to Uphold El Dorado County v. Board of Supervisors, supra*, 79 Cal.App.4th at p. 516), to affect the broader world or "general public" as the statute puts it.

In *Press*, the interests of the plaintiffs easily transcended any tangible or sensory benefits they might have received from the litigation. Some people (idealists, public-spirited citizens, ideologues, busybodies, activists, call them what you will, it makes no difference in this context) will litigate for their principles no matter what. Hence the plaintiffs in *Press* carried a genuinely disproportionate burden in terms of their material, sensory-rooted interest. They were entitled to fees.

By contrast, the claimant in *Williams* was concerned with the tangible, quite physical impact on him personally. It can make a big difference to your

lifestyle whether you come home at night and find a quaint Victorian structure next door, or a large apartment building, even if your balance sheet remains the same. There was no significant element of transcendence in the claimant's efforts. Forcing the local land use body to consider its own guidelines (see *Williams v. San Francisco Bd. of Permit Appeal, supra*, 74 Cal.App.4th at p. 964) was merely a means to preserving the tranquility of his neighborhood by delaying the project. The plaintiff was not some "guideline geek" maniacally out to make sure that all local entities of government follow their rules just for the sake of following their rules—he simply wanted to control his own immediate environment. He got no fees at all.

In the middle is *Families Unafraid*. Nobody's property values were threatened by the upscale 8,000-acre project slated for grazing land pretty much out in the middle of nowhere (see *Families Unafraid to Uphold El Dorado County v. Board of Supervisors, supra*, 79 Cal.App.4th at p. 510). But it could not be gainsaid that the plaintiffs' lifestyles were wholly immune to the project, either. The degree to which the "character" of a community may be changed is the subject of a whole different body of law in the land use area, but suffice to say that the character of the rural area in *Families Unafraid* was threatened with change. The claimants *may* have gotten fees. The court remanded the matter to the trial court to see if there really was a disproportion between the costs of the earlier litigation and the plaintiffs' "nonfinancial" interests there. (See *id.* at p. 520.)

## C. *The Case Before Us*

### 1. *No Fees for Trial Work in Hammond I*

We return to the facts behind Agran's fee application in the appeal before us. Clearly, there was no abuse of discretion on the trial court in denying fees for the trial court work leading up to the appeal in *Hammond I, supra*, 76 Cal.App.4th 1181.

The trial work done by Agran's lawyers was directly and intimately connected to Agran's quest for elective office. As the trial court pointed out, Agran had a palpable personal stake in the statement and the election. He was a front-running candidate and there was a pressing immediate need to have a candidate's statement of some kind in the voters pamphlet, lest Agran be conspicuously missing from the voters pamphlet.

### 2. *No Fees for Appealing the Ruling Concerning the Statement About Leading the Council in Hammond I*

One of the issues in *Hammond I* was the accuracy of Agran's statement he led the city council in developing Irvine's general plan. While the trial court

was clearly concerned with the qualifications issue, general appellate procedure (given that the trial court had ordered that portion of the statement to be amended) meant there had been an implied finding that the statement was not factually accurate. On appeal, we disagreed, concluding that the statement was *not* inaccurate. (*Hammond I, supra*, 76 Cal.App.4th at p. 1193.)

Material defending the statement about leading the city council occupied pages 21 through 27 of Agran's opening brief in *Hammond I* (pt. II.C.1.), and pages 23 (bottom half) through 28 of the reply brief (pt. III.A.). We affirm the trial court's denial of fees insofar as it applied to this work.

Political candidates have intense personal interests in their reputations, and there is a long-standing recognition in our culture of its importance. The biblical proverb that "a good name is rather to be chosen than great riches" is on point in this context, because it underscores the idea that reputational interests can be more important than financial ones. Moreover, reputational interests tend to be intensely personal, i.e., they do not implicate the public interest in a way that perhaps other nonpecuniary interests might (e.g., as in *Press*, trying to curb oil company profits). Here, the major importance of the "led the city council" issue was to Agran personally, who had had his reputation for veracity besmirched by the trial court's implied finding.

And in fact it was a personal concern of Agran's that extended beyond the election that Agran won. A candidate's ability to govern effectively *after* taking office is directly related to his or her good reputation. This close proximity between the candidate's reputational interests undercuts the transcendence and disproportionality of interest to burden that is the essence of the necessity and financial burden clause of section 1021.5. Because of a candidate's understandable protectiveness over his or her reputation, any fees here would undercut the proportionality test inherent in the statute.

### 3. *No Fees for Seeking Fees in Hammond I*

Agran devoted almost half his opening brief in *Hammond I* to a request that this court determine that he should receive fees in the event that he prevailed and obtained a reversal of the trial court's order.

The question of fees for fee-related work was addressed by our high court in *Serrano v. Unruh* (1982) 32 Cal.3d 621 [186 Cal.Rptr. 754, 652 P.2d 985], sometimes referred to as "*Serrano IV*." There the court faced the question of whether the prevailing public interest litigants could obtain fees for a previous win (*Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*)), which had merely established their right to fees.

The problem with awarding such fees, as Justice Richardson pointed out in his dissent, was that fees for fee-related work simply didn't meet the requisites of section 1021.5. No public benefit was conferred; all the benefit was personal: " 'The only right secured on appeal in *Serrano III* was respondents' entitlement to a fee award, and the only benefit conferred by that litigation was personal to [the public interest law firms involved].' " (*Serrano IV, supra,* 32 Cal.3d at p. 645 (dis. opn. of Richardson, J.).)

What persuaded the majority to hold otherwise were certain necessary implications of the statute. If a public interest litigant could not obtain any fees for fee-related work, then the private attorney general doctrine could "often be frustrated, sometimes nullified, if awards are diluted or dissipated by lengthy, uncompensated proceedings to fix or defend a rightful fee claim." (*Serrano IV, supra,* 32 Cal.3d at p. 632.) A corollary to that idea was that if attorneys were required to expend time litigating the fee claim itself, yet go uncompensated for that time, their effective hourly rate could be cut at will by their opponents. (*Id.* at p. 634.) Specifically, the high court was worried that a firm rule precluding fees for fee-related work would give too much power to a claimant's opponents: "It could permit fees to be determined by the litigiousness of losing parties." (*Ibid.*; see also *id.* at p. 638 [observing that a party could not " 'litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response' "].)

However, the *Serrano IV* majority also recognized that a rule allowing fees for fee-related work was not hard and fast: The rule operated only "ordinarily" and was subject to the exception that special circumstances could indeed render a fee for fee-related work award unjust. (See *Serrano IV, supra,* 32 Cal.3d at p. 633.) On that score the *Serrano IV* majority recognized that fee claimants should not be able to "force their opponents to a Hobson's choice of acceding to exorbitant fee demands or incurring further expenses by voicing legitimate objections." (*Id.* at p. 635.) Elaborating, the court said that fee claimants should be compensated for "hours reasonably spent on fee-related issues" and that a "fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether." (*Ibid.*)[6]

We conclude that special circumstances here require that there be no fees for the "fee work" on appeal in *Hammond I.* The core concern in *Serrano IV*

---

[6]Accordingly, *Sundance v. Municipal Court* (1987) 192 Cal.App.3d 268 [237 Cal.Rptr. 269] (*Sundance II*), an appellate opinion relying almost entirely on *Serrano IV*, should not be read for the proposition that *Serrano IV* sets forth an *inflexible* rule that "all hours reasonably spent" in the litigation should be compensated. (See *Sundance II, supra,* 192 Cal.App.3d at p. 273 ["The issue posed is whether plaintiffs are entitled to all hours reasonably spent in pursuit of this litigation . . . ."].)

*Sundance II* arose out of a class action brought by "four public inebriates and one taxpayer" that resulted in a published opinion, *Sundance v. Municipal Court* (1987) 42 Cal.3d 1101 [232

was that the private attorney general doctrine could be frustrated if fees were not awarded for fee work because tenaciously litigating opponents could unilaterally exact costs on the fee claimant. That concern is completely inapplicable with regards to the fee-related appellate work in *Hammond I*. Indeed, *Hammond I* presents almost an exact opposite of the situation which the *Serrano IV* court feared.

---

Cal.Rptr. 814, 729 P.2d 80] (*Sundance I*)) changing the procedures for the incarceration and treatment of public inebriates. (See *Sundance II, supra*, 192 Cal.App.3d at p. 271.) In the subsequent litigation seeking fees under section 1021.5, the successful plaintiffs cross-appealed, contending that the trial court erroneously excluded some 458 hours of attorney time spent on legal theories on which the plaintiffs did not prevail. (*Sundance II, supra*, 192 Cal.App.3d at p. 271.) The appellate court agreed, noting that section 1021.5 makes no mention of "excluding compensation for the successful parties' unsuccessful legal theories" and that "as a practical matter, it is impossible for an attorney to determine before starting work . . . whether it will or will not be accepted by the court years later following litigation." (*Sundance II, supra*, 192 Cal.App.3d at p. 273.) The court rejected application of a United States Supreme Court opinion, *Hensley v. Eckerhart* (1982) 461 U.S. 424, 434-435 [103 S.Ct. 1933, 1940, 76 L.Ed.2d 40], which had distinguished work on one "claim" from another. (See *Sundance II, supra*, 192 Cal.App.3d 268.) Even though *Serrano IV* had been clearly influenced by federal precedent (see *Serrano IV, supra*, 32 Cal.3d at pp. 632-634 [supporting result with federal precedent]), the *Sundance II* noted that *Serrano IV* articulated an independent state rule. (*Sundance II, supra*, 192 Cal.App.3d at p. 274.)

The *Sundance II* court need not have gone so far as to suggest that there really was a conflict between the federal approach as expressed in *Hensley* and the California one as expressed in *Serrano IV*. In *Sundance II*, the theories that were not compensated by the trial court still had a direct relationship to the litigation which established the public right that was vindicated in *Sundance I*. (Those theories were "waste of taxpayers' funds" and violation of equal protection. ([See *Sundance II, supra*, 192 Cal.App.3d at p. 273].) There was no need to repudiate the federal rule as articulated by *Hensley*, which involved work on *unrelated* "claims." (See *Sundance II, supra*, 192 Cal.App.3d at p. 273.)

The distinction between diverse legal *theories* bearing on a particular "right" that is established for purposes of section 1021.5 and unrelated "claims" (which may have nothing to do with any rights established for purposes of § 1021.5) is important. The core idea in *Sundance II* is that an attorney doesn't know beforehand which legal ideas will be accepted by a court—something that would seem particularly true in public interest litigation where a variety of constitutional theories may hover over the litigation like spirits offering themselves for conjuring. So if the hours on the nonaccepted theories were "reasonably spent," not to include them in the fee award would deny the "just compensation for expenses actually incurred in vindicating a public right." (*Sundance II, supra*, 192 Cal.App.3d at p. 273.) But it does not follow that time spent to vindicate an unrelated claim not otherwise within the purview of section 1021.5 was time *actually incurred* in vindicating a public right.

For example, as we show below, Agran *should* be compensated for his reasonable fees spent on the scope of the statute issue. That was time actually incurred vindicating a public right. It will make no difference whether some of the ideas or precedents or "theories" that he mentioned in his briefs in *Hammond I* in support of his position on the scope of the statute issue were actually used or adopted by this court. Under *Sundance II*, if the time was reasonably spent vindicating an important public right, that is enough. On the other hand, time spent on the "leading the council" statement was an unrelated separate "claim," and time spent on it was not time spent vindicating an important public right.

The "fee work" in the opening brief was fundamentally premature. The best one could say was that it was a preemptive request to have the appellate court determine Agran's entitlement to fees under section 1021.5 rather than, as happened, have the matter remanded for consideration by the trial court in the first instance. But such a preemptive request was hardly necessary to any possible right to fees under the statute, and doesn't implicate any of the ideas on which *Serrano IV* was based. The fee request work was not done in response to any "tenaciousness" on Hammond's part. (Hammond filed about as "light" a respondent's brief in *Hammond I* as possible, and didn't respond to much of Agran's fee request at all—so much so that Agran only had to devote four pages in his reply brief to a subject that he had devoted more than 30 pages to in his opening brief.) No fee award was under attack. To award fees for the premature fee request work on appeal in *Hammond I* would convert the rationale in *Serrano IV*—which was to *protect* fee claimants from having their right to a fee award unilaterally diluted by the litigiousness of an opponent—into an offensive weapon whereby fee-related fees could be gratuitously inflicted without significant provocation on the part of an opponent.

### 4. *Agran Should Obtain Fees for the Appellate Work in Hammond I on the Scope of the Statute*

■ The trial court's rationale for denying any fees at all applies precisely to the trial work in *Hammond I*, and to the appellate work on the factual accuracy issue as well. But it collapses completely when applied to the appellate fee request concerning the issue of whether section 13307 would allow statements of candidates' viewpoints. That issue didn't concern itself with some factual point peculiar to one candidate, but to a matter that affects all voters and candidates. And on that issue, Agran's appeal was the quintessential undertaking of litigation in the public interest removed from one's own immediate lifestyle benefits.

The election was over. Agran had won. He could just as easily have gone fishing as undertaken the task of litigating in the appellate court the question of whether a candidate—*any* candidate, not just Agran—has the right under section 13307 to express his or her views in a ballot pamphlet candidate's statement. That was litigation over a point that readily transcended his personal stake in his own particular candidate's statement, and will necessarily inure to every voter who reads a ballot pamphlet in a local election wondering what policies a candidate intends to pursue in office.

Hammond counters that Agran was possessed of two interests to prosecute the appeal, undercutting the disproportionality of his interest to his efforts.

We have already dealt with one—Agran's reputational interest. As we have seen, to the degree that the appellate litigation encompassed an effort by Agran to remove any implied stain on his veracity concerning the "led the council" statement, Agran should not receive fees for appellate efforts devoted that (minor) issue.

But any reputational interest of Agran's in the scope of the statute issue was attenuated indeed. *By definition* any litigant who qualifies for a section 1021.5 fee award will necessarily be a public "benefactor" in some sense, and will have his or her reputation thereby enhanced.

The other interest asserted by Hammond is a little more elliptical. Let's call it the "make-an-example" interest. According to Hammond, Agran litigated *Hammond I* with a Javert-like intensity—including hiring his own son to overlitigate the case—basically so that Agran could obtain a large fee award under the private attorney general doctrine, and thereby make an example of Hammond: No one would ever again have the temerity to go to court against Agran, at least in a political context. For Hammond, this attempt to make an example of him is a special circumstance that renders any fee award unjust. (See *Bartling v. Glendale Adventist Medical Center* (1986) 184 Cal.App.3d 97, 104 [228 Cal.Rptr. 847] ["If special circumstances render an award unjust, the court can deny attorney fees."].)

We reject the contention. The basic reason is that the object of the appellate work in *Hammond I* which *merits* fees—the scope of the statute issue—was inherently removed from any particular spite Agran may have had for Hammond, or any need to make an example of him. It was a discrete legal issue serenely independent of the personalities of the litigants. To the degree that Agran may have incurred unreasonable fees litigating that particular issue, with the idea in the back of his mind that he could impose an exorbitant fee award on an opponent, the problem is self-correcting. On remand the trial court will be charged with determining the *reasonable* hours spent to prosecute the appeal of the qualifications issue and the *reasonable* rate for those hours. (See *Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 26 [97 Cal.Rptr.2d 797].) If Agran incurred more than was reasonable under those established standards, he will end up paying them himself (or the fees will be forgiven by the attorneys).

The problem is also self-correcting because on remand Agran will not be entitled to recover fees for the amount of work that was (futilely as it turned out) devoted to the attorney fee issue itself in *Hammond I*.

Finally, an animus theory won't hold up on this record. Recall that it was *Hammond* who initiated the litigation against Agran in *Hammond I*. Agran no doubt has some reason to have at least a little animosity toward Hammond on that basis alone. But the record fails to disclose anything near the kind of animosity that would make an otherwise appropriate award unjust. Besides the political rivalry and the large fees incurred to seek fees, there is nothing to indicate any personal retribution or malicious motivation on Agran's part: There is only the fact that Agran was sued by Hammond. Indeed, on this record we only see a highly professional political contest and a highly civilized joining of the issues on appeal. Both parties and their attorneys have conducted this litigation with an exemplary degree of professionalism that belies any personal animosity extrinsic to the issues.

A related argument made by Hammond is his assertion, based on the "special circumstance" language discussed above in *Serrano IV*, to the effect that the very act of making an "outrageously unreasonable" fee request can be grounds for the complete denial of fees. The argument, of course, rests on the assumption that the claimant has indeed made an "outrageously unreasonable" fee request. Hammond argues that Agran's *total* fee request in excess of $61,000 is a figure that "doesn't even pass the smell test."

The argument, however, fails factually when one breaks down that fee request into its constituent parts. Remember that we have already determined that Agran should not receive fees for the trial work in *Hammond I*, nor any fees for trying to obtain fees in *Hammond I*. And we need not address fees spent in the trial court after *Hammond I*. The requested fees attributable to the scope of the statute issue would appear to be about half the $61,000 fee request (the exact amount will be up to the trial court to determine). When viewed in that light, Agran's fee request cannot be said to be so "outrageously unreasonable" that a total denial of all fees would be justified.

Finally, the parties have raised some interesting public policy arguments regarding the consequences of fee awards for litigation arising out of challenges to candidate statements as permitted by section 13313. For Hammond, allowing any fee award for such litigation has an unwarranted deterrent effect on challenges permitted by the statute. He points out that citizens interested in keeping public officials honest might be deterred from seeking to correct false or misleading statements proffered in proposed candidate statements if the litigation goes against them. For Agran, *not* allowing such fee awards only encourages what he calls a "veritable cottage industry of lawyers and professional plaintiffs specializing" in challenges under sections 13307 and 13313.

These arguments stray from the focus of the statute,[7] and specifically the necessity and financial burden clause. The critical point here is that the qualification issue was one which transcended Agran's personal interests because it dealt with the generic scope of section 13307, and not with the typical, mundane squabbles over the factual accuracy of a statement peculiar to one candidate's personal history.

### D. *Considerations on Remand*

Because we break down the fee request into its constituent parts, we must deny Agran's request that this court simply direct the trial court, on remand, to award him all fees previously requested. We do, however, honor his alternative request to remand the matter only for a determination of the *amount* of fees to which he is entitled.

■ The basic "lodestar" methodology by which a court determines fees is well established, having its genesis in *Serrano III, supra*, 20 Cal.3d 25. It is nicely summarized in *Lealao v. Beneficial California, Inc., supra*, 82 Cal.App.4th at page 26: "The lodestar (or touchstone) is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented."

Because the trial court here precluded attorney fees a priori, it never was forced to engage in the usual lodestar analysis required when fees should be awarded under section 1021.5. This it will have to do on remand.

A few comments need be made in that regard. First, as the *Lealao* court demonstrated, the factors which a trial court may consider are not fixed (see *Lealao v. Beneficial California, Inc., supra*, 82 Cal.App.4th at pp. 40-43); our state has a relatively "permissive attitude" as to the elements that go into what will ultimately make up the multiplier.

Given that flexibility, we must conclude that several of Hammond's concerns about the amount of any fee award may be addressed for the first time by the trial court on remand. Specifically, Hammond complains that

---

[7]We must confess, though, that we may have had a hand in the degree to which the parties have addressed them, given our observation in *Hammond I* that First Amendment rights might be implicated by the possibility of a fee award. (See *Hammond I, supra*, 76 Cal.App.4th at p. 1194.)

Agran hired his own son as his lawyer so as to facilitate the inflation of attorney fees. (After all, when your own son is doing your legal work, odds are that you don't have to worry about being sued just in case the fee award doesn't cover all the time he spent on the case.) Well maybe; maybe not. The trial court will be able to examine the degree to which fees attributable to the scope of the statute issue have been inflated by nepotism, or, alternatively, might be independently justified regardless of the familial relationship between client and attorney.

Additionally, Hammond argues that, as a private citizen, it would be unfair to penalize him for initially bringing the challenge to Agran's candidate statement, which was *itself* brought in the public interest of a better informed electorate. (See *Hull v. Rossi* (1993) 13 Cal.App.4th 1763, 1768 [17 Cal.Rptr.2d 457] ["The state has a strong interest in providing the electorate with accurate information in the voter pamphlets."].)[8]

To the degree that Hammond attacked Agran for the inaccuracy of the "led the council" statement, he isn't on the hook for attorney fees. The statement was not the one that made law in *Hammond I.* Our brief comments on it there did not enforce any important right affecting the public interest. As to the degree to which Hammond himself arguably undertook to defend the appeal in *Hammond I* in the public interest, it is a matter which may involve disputed factual issues as yet undecided (e.g., Hammond's true motive in bringing suit against Agran). We shall therefore leave to the trial court for consideration in the first instance on remand the question of whether any public spiritedness on Hammond's part has any bearing on the amount of fees which Agran should be awarded.[9]

## IV. DISPOSITION

The order denying fees is affirmed (a) insofar as it denies fees for trial work in *Hammond I,* and (b) insofar as it denies fees for appellate work in

---

[8]*Hull* is a case on which Agran heavily relies, because there the claimants were not the plaintiffs, but were initially sued in the trial court for their statement on behalf of a ballot measure. However, at heart *Hull* is a "prevailing party" case, because the central issue before the court was whether modifications required of the claimants' statement meant they weren't successful. (See *Hull v. Rossi, supra,* 13 Cal.App.4th at p. 1769.) To the degree that the court held that fees should have been given the claimants lest citizens not be willing to "participate in preparation of ballot arguments" (*ibid.*), the case is inapposite to our analysis here. Almost by definition, participation in a ballot argument implicates transcendent interests that running for office doesn't. Unlike politicians, where ego is always a factor, progenitors of ballot arguments are interested in policy *qua* policy.

[9]One comment though: Because Hammond is a private citizen, no "public moneys" are being sought here, and therefore section 85300 of the Government Code (precluding candidates from accepting "any public moneys for the purpose of seeking elective office") has no relevance.

*Hammond I* attributable to (i) the "led the council" statement and (ii) the request for fees itself. The order is reversed insofar as it denies fees for the appellate work in *Hammond I* attributable to the scope of the statute issue.

In considering the amount of fees to be awarded, the trial court is to isolate the hours reasonably attributable to the scope of the statute issue, and then determine reasonable compensation for those hours.[10] It should then determine a multiplier, positive or negative, based on a variety of factors pertaining to the facts of this case, including the novelty and difficulty of the scope of the statute issue in the *Hammond I* appeal, the extent to which that appeal precluded other work by Agran's son, and the contingent nature of any fee award. Our opinion is without prejudice to either side proffering yet more factors.

Any question of seeking attorney fees for work done *after Hammond I* is now premature. In the interests of justice, each side will bear its own costs on appeal.

Rylaarsdam, J., and Aronson, J., concurred.

A petition for a rehearing was denied June 20, 2002, and the opinion was modified to read as printed above.

---

[10]Alas, one of the criticisms of the established lodestar methodology is that it consumes an undue amount of trial court time. (See *Lealao v. Beneficial California, Inc., supra,* 82 Cal.App.4th at p. 30.) There is nothing we can do about it, though the Supreme Court might one day want to reconsider the lodestar approach in light of the rather significant deficiencies in the approach. (See *id.* at p. 29, quoting *Third Circuit Task Force, Court Awarded Attorney Fees* (1985) 108 F.R.D. 237, 246-249.) However, to the degree that the very existence of the lodestar approach prompts lawyers to spend excessive time on a case, the problem is self-correcting given that the court is required to determine only the *reasonable* hours in fixing the lodestar amount.