Filed 11/13/15  Torres v. Cedars-Sinai Medical Center CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| ABRAHAM TORRES, | B259601 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC507315) |
| v. | |
| CEDARS-SINAI MEDICAL CENTER, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Suzanne G. Bruguera, Judge.  Affirmed.

Law Offices of Loyst P. Fletcher and Loyst P. Fletcher for Plaintiff and Appellant.

Davis Wright Tremaine, Emilio G. Gonzalez, Rochelle L. Wilcox and Evelyn F. Wang for Defendant and Respondent.

_____

Appellant Abraham Torres (Torres) appeals from the trial court's grant of summary judgment for respondent Cedars-Sinai Medical Center (Cedars-Sinai). Torres, a Filipino, argues triable issues of fact remain as to whether his termination was a pretext for his former supervisor Mark Rojas's (Rojas) racial animus against him as an Asian. We disagree and affirm.

## BACKGROUND

Torres was employed by Cedars-Sinai's plant operations department from 1991 to 2012. He was most recently an operations supervisor. Starting in 2006, part of Torres's operations supervisor's duties was to supervise the testing, inspection, and repairs to the fire alarm system and its supporting safety system. This responsibility required him to supervise Cedar-Sinai workers, plan and assign work to outside vendors, and implement internal operational procedures. Specifically, Torres was, by contract and his own admission, "[r]esponsible for necessary arrangements to maintain operations of the facility during system shutdowns for repairs [or] testing."

The plant operations department contracts the majority of its fire and safety systems testing to outside vendors. It contracted with SimplexGrinnell to operate and conduct tests on the fire alarm's supporting safety system called the Emergency Power Off (EPO) system. In the event of a fire, the EPO system shuts off power from the electrical grid to select areas in the hospital to prevent new fires or explosions from occurring. In particular, the EPO system protects the intensive care unit (ICU) building's centralized data rooms, which allow ICU nurses to monitor patients' vital signs from one location through a computer network (Network). To ensure the Network is operational even when the EPO system shuts off power from the grid, the ICU data rooms are also connected to a back-up, battery-powered energy source called an uninterrupted power supply (UPS). The UPS is intended to be a temporary source of power and produces an energy supply for only about 10 to 15 minutes. When the EPO system shuts off electricity from the grid to the data rooms, the UPS will automatically supply power, keeping the Network operational. Before the limited UPS energy reserve is depleted, the

plant operations department must restore continuous grid power to the data rooms, however, or the data rooms will lose power and shut down the Network.

Cedars-Sinai periodically tests the EPO system. The EPO test requires the timed coordination of a team of Cedars-Sinai and SimplexGrinnell personnel with technical knowledge. At a minimum, the EPO test requires the following: (1) someone to physically simulate a fire in the ICU tower and trigger the EPO system; (2) someone to monitor the grid's power supply and confirm the EPO properly functioned by shutting off the grid's power; (3) someone to restore power from the grid before the UPS is depleted; (4) someone (presumably the monitor) to confirm the grid's electricity was restored. This basic procedure was not followed by the EPO testing team on February 27, 2012, resulting in a total loss of power to the data rooms. The data rooms' loss of power shut down the Network, preventing the ICU nurses from being able to monitor patients' vital signs from a central location.

After this serious failure, Torres's Latino supervisor, Rojas, was instructed by one of Cedar-Sinai's vice presidents to initiate an investigation and take corrective action, if necessary. Rojas conducted an investigation, concluded Torres was ultimately at fault, and recommended discharging Torres. Cedars-Sinai discharged Torres in March 2012.

Torres sued Cedars-Sinai and Rojas for (1) wrongful termination, (2) discrimination, (3) harassment, and (4) defamation. More specifically, Torres claimed his termination was wrongful because it was a pretext for Rojas's discriminatory racial animus toward him as an Asian.[1] Torres also claimed Rojas harassed him in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940) through racial discrimination. Finally, Torres claimed his discharge memorandum contained unprivileged defamatory statements about his alleged incompetence, inappropriate conduct, and violation of company policies and procedures. After discovery, Cedars-Sinai moved for summary judgment, or in the alternative,

---

[1] While some may argue with the classification of Filipinos as Asian, Torres self-identifies as "Asian of Filipino descent" and believes Filipinos are ethnically Asian.

3

summary adjudication of issues. Torres opposed the motion. Cedars-Sinai replied to Torres's opposition and also submitted 83 objections to Torres's evidence. At the trial court's request, the parties then submitted draft orders. The trial court made a few interlineations to Cedars-Sinai's proposed order, including sustaining all of Cedar-Sinai's objections, and entered summary judgment in its favor. Torres appealed.

## DISCUSSION

On appeal, Torres argues the court erred in granting summary judgment because there remain genuinely disputed issues of material fact. Specifically, Torres disputes whether he was responsible for the failed EPO test; whether Rojas used the failed EPO test as a pretext to fire him because Rojas is racially biased against him as an Asian; and whether the allegedly defamatory statements in his termination memorandum are accurate. We disagree and affirm.

### I. Standard of Review

A trial court must grant summary judgment when no triable issue exists as to any material fact, entitling the moving party to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) To defeat summary judgment, the plaintiff must "'set forth the *specific* facts showing that a triable issue of *material* fact exists as to that cause of action . . . .' [Citations.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477, italics added.) We review the trial court's grant de novo. (*Id.* at p. 476; *Romero v. American President Lines, Ltd.* (1995) 38 Cal.App.4th 1199, 1203 ["in a discrimination case . . . we must review the matter de novo, granting no particular deference to the trial court ruling"].) That is, we consider "all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill*, at p. 476.) When considering all the evidence, however, we "'view the evidence in the light most favorable to the plaintiff[] . . .' and 'liberally construe plaintiff['s] evidentiary submissions and strictly scrutinize defendant['s] own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiff['s] favor.' [Citation.]" (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 96–97.)

4

A three-part burden-shifting analysis applies in discrimination termination actions if no direct evidence of discrimination is offered. (*McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802–804 [93 S.Ct. 1817] (*McDonnell Douglas*); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).) Torres presented no direct evidence of discrimination, as described below; therefore, the burden-shifting test applies. Under *McDonnell Douglas*, the plaintiff, first, has the burden to establish a prima facie case of discrimination. (*Guz*, at pp. 354–355.) A prima facie case is established "as follows: '(1) complainant belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged; and (4) . . . his job was filled by an individual of comparable qualifications not in the protected class.' [Citations.]" (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 200 (*Caldwell*) [following *McDonnell Douglas*].) If the plaintiff establishes a prima facie case, a presumption of discrimination arises. (*Guz*, at p. 355.) Second, the burden then shifts to the defendant to rebut this presumption by demonstrating a legitimate reason for the plaintiff's termination. (*Id.* at pp. 355–356.) If the defendant establishes a legitimate reason for plaintiff's termination, the discrimination presumption "disappears." (*Id.* at p. 356.) Third, the burden then shifts again to the plaintiff to demonstrate the allegedly legitimate reason was actually a pretext. (*Ibid.*) These inquiries "are questions of law for the trial court, not questions of fact for the jury." (*Caldwell*, at p. 201.)

Courts of Appeal have disagreed somewhat about the application of this analysis. In particular, courts have disagreed about the degree to which a plaintiff must demonstrate pretext. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004 (*Hersant*).) The majority of courts, however, require "the employee [to] rebut the employer's stated nondiscriminatory reason with substantial evidence of its falsity or present other evidence suggesting a discriminatory basis, or some combination of the two such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination. [Citation.]" (*Id.* at p. 1004; see also *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735.) "[T]he great weight of federal and California authority holds that an employer is entitled to summary judgment if,

5

considering the employer's innocent explanation for its actions, the evidence *as a whole* is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz*, *supra*, 24 Cal.4th at p. 361, italics added.)  That is, "'[t]he [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  [Citations.] Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence" [citation], and hence infer "that the employer did not act for [the asserted] nondiscriminatory reasons."  [Citations.]'  [Citations.]"  (*Hersant*, *supra*, 57 Cal.App.4th at p. 1005.)

In accord, the United States Supreme Court has held "'"an employer would be entitled to judgment as a matter of law if . . . the plaintiff created only a *weak issue of fact* as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.  [Citations.]'"  (*Guz*, *supra*, 24 Cal.4th at p. 362, italics added, quoting *Reeves v. Sanderson* (2000) 530 U.S. 133, 148 [120 S.Ct. 2097, 2109].)  Ultimately, "[i]f the employer presents admissible evidence . . . that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing."  (*Caldwell*, *supra*, 41 Cal.App.4th at p. 203.)

We agree requiring the plaintiff to demonstrate pretext by substantial evidence is the proper standard because a mere scintilla of evidence alone cannot be enough to defeat summary judgment. (*Martin*, *supra*, 29 Cal.App.4th at p. 1735 ["The purpose of the summary judgment procedure . . . is to identify those cases in which there is no factual issue which *warrants the time and cost of factfinding* by trial," italics added].)

II.     **Summary judgment was proper**

    A.     **Torres failed to demonstrate wrongful termination**

        1.     **Torres made a prima facie showing**

Torres established a prima facie case under *McDonnell Douglas*, *supra*, 411 U.S. 792. Torres easily meets the first and third elements: he belongs to a protected class as a Filipino and he was discharged. As to the second element, whether Torres's job performance was satisfactory, Torres's 20-year career speaks for itself. Although Torres had several write-ups from superiors relating to job performance in later years, these alone, at least at the prima facie stage, are not enough to demonstrate unsatisfactory job performance when weighed against his 20-year career. (*Caldwell*, *supra*, 41 Cal.App.4th at p. 197 ["'The amount [of evidence] that must be produced in order to create a prima facie case is "very little"'"].) As to the fourth element, whether a similarly qualified individual who was not in the protected class filled Torres's job, Torres's replacement was Steven Poore (Poore), a white male who had assisted Torres prior to his termination. Because Poore appears to have been at least minimally qualified due to on-the-job training and he is not a member of the protected class (Asian), Torres establishes the fourth element. Finally, Torres needed to demonstrate by a preponderance of the evidence that his termination was at least, in part, motivated by discrimination. (*Watson v. Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1290.) Although the discrimination evidence he presented ultimately failed, Torres did offer declarations, deposition testimony, and other documents which might have demonstrated discrimination. We agree with the trial court that Torres established a prima facie case of discrimination.

        2.     **Cedars-Sinai rebutted the discrimination presumption**

Once Torres established a prima facie case, a presumption of discrimination arose. (*Guz*, *supra*, 24 Cal.4th at p. 355.) To rebut this presumption, Cedars-Sinai had the burden to show it terminated Torres for a legitimate reason. (*Id.* at pp. 355–356.) Cedars-Sinai met this burden. Torres was, by contract and admission, "[r]esponsible for necessary arrangements to maintain operations of the facility during system shutdowns

7

for repairs [or] testing." To fulfill this duty in years past, Torres had not only communicated with SimplexGrinnell personnel to facilitate EPO testing, he had also participated in it. As a seasoned supervisor with specific prior EPO testing experience and jurisdiction over such a test, Torres had the ultimate obligation to ensure Cedars-Sinai's facility operations were maintained during the EPO testing.

The record and common sense do not support Torres's counter-contention that Poore was primarily responsible for the February 27, 2012 EPO testing while Torres's nonsupervisory role was merely to open doors for SimplexGrinnell personnel. Torres tries to limit his role in the planning of the EPO testing as simply being "cc'd" on e-mails and sitting in on meetings. E-mails between Torres, Poore, and SimplexGrinnell personnel refute this contention, however. Torres was the direct recipient (as opposed to the copied recipient) of numerous e-mails, was addressed by name in the text of several e-mails, and responded to several different people during the planning with requests and comments. For example, Torres himself requested, "as we ha[ve] done before can we have the shutdowns on Monday nights so that I can be around[?]"[2] Poore also wrote to Cedars-Sinai employee Aldaberto Munoz, "Berto, Abe [Torres] will be testing the EPO system," to which Torres confirmed that he would contact Munoz on the night of the testing. Even if we accept Torres's claim the e-mails show he was not in charge of planning the EPO test details as true, he was still aware of, and bore the responsibility as a supervisor to be aware of, the unfolding plans for the EPO testing. If he thought the planning was inadequate, whether because key players were missing from the team or because the execution plan was not sufficiently specific, Torres needed to take corrective action. We reject Torres's attempt to blame Poore, who was not Torres's superior and

---

[2] If Torres's only role were to open doors, his presence would be a necessity and he would not have sent an e-mail asking to be present. Along these same lines, Torres's statement suggests he viewed himself as having a supervisory role, as he had in the past. Suggesting that 2012 was, indeed, no different from past years, Juan "John" Gomez, a SimplexGrinnell employee, even complained during scheduling issues, "this feels like every other year."

who was not ultimately responsible for the testing or the deficient planning, especially in light of Torres's knowledge and participation in the planning.

Eventually, the group's planning led to the following EPO test team: (1) Rick Urban (Urban), a SimplexGrinnell technician who physically triggered the EPO system; (2) Torres, who, at least initially, accompanied Urban in the ICU tower being tested; (3) Munoz, who was remotely monitoring the Network and its power supply; and (4) Juan "John" Gomez (Gomez), a SimplexGrinnell technician who was remotely monitoring the fire alarm and EPO systems.

Even if Poore were entirely responsible for the planning, which he was not, Torres's execution of the EPO test, by his own account and objective evidence, was also flawed. As a preliminary matter, regardless of whether during the planning Torres thought he would supervise or participate in the EPO test, Torres *did* in fact participate in it. Shortly before the test, it was Torres, not Poore, who agreed to be the person to communicate about the Network's supply status with Munoz, who was monitoring the Network's power supply remotely. Torres told Munoz via e-mail that he would call Munoz "before and after the shutdown."[3] During the test, it was Torres who called another Cedars-Sinai worker to ask how to locate the shunt trips to restore the grid's power and Torres who reset the shunt trips on, at least, the first floor tested. It is disingenuous of Torres to claim his only role in the EPO testing was to open doors and he should not be held accountable for any of the other EPO testing aspects, when he was communicating with Munoz about the Network's status, calling other Cedars-Sinai employees to request their assistance, and resetting the shunt trips.

On the first floor tested, the power remained on after Urban triggered the EPO system (presumably because the UPS had activated). In accord with protocol, Torres, in his deposition, said that he "turned the power back on" (presumably to the grid by resetting the shunt trip) and confirmed with Munoz that the power was back on. Torres

---

[3] Yet Torres later testified he was confused when Munoz did not call him, demonstrating Torres's lack of care in executing the EPO test.

admitted the uninterrupted power supply "puzzled" him, however, and it was "[n]ot like last year."[4] He also admitted he knew that loss of power could have serious implications for the ICU. Torres makes no attempt, however, to show he acted on his puzzlement to investigate or remedy the potentially serious electrical problem before the testing continued.

After testing one floor, Torres and Cedars-Sinai dispute whether Torres accompanied Urban to each floor to continue the testing. Under either scenario, however, Torres's supervision of the EPO test was deficient. Urban claims Torres accompanied him to each of the subsequently tested floors. If Torres did accompany Urban, Torres did not ensure the shunt trips had been reset, restoring the grid's power, before he and Urban proceeded with testing other floors; he also did not confirm with Munoz whether the grid's power was restored on each floor. Torres claims he left Urban alone to complete what Torres expected to be the remainder of the test while he retrieved a special key necessary to unlock one of the floors. Torres admitted he knew that someone needed to check with Munoz that power had been restored from the grid on each floor. Yet Torres also admitted that Urban and Munoz had no ability to communicate with each other; Torres was their only link to each other. If Torres did leave Urban alone, he risked that Munoz would not be able to contact Urban and stop him from continuing the test if the data rooms lost power. Even if Torres was willing to take that risk because Torres thought *Gomez* could confirm for Urban that the grid's power was restored,[5] Torres admits he did not truly determine whether Urban knew how to restore the grid's power by resetting the shunt trips before leaving Urban alone. As for whether Torres himself knew how to reset the shunt trips, Torres stated numerous times in his deposition he did,

---

[4] It is unclear why Torres was confused that the power remained on. He claims the power had been totally shut off on occasion in previous years, although this makes little sense because the EPO system, if it was working properly, should have automatically begun to supply power once the EPO system shut off power from the grid.

[5] Gomez was monitoring whether the fire alarm and EPO had been tripped remotely, and according to him, confirmed, at least on the first floor tested, that power from the grid had been shut off.

despite saying in his declaration that he did not.[6]  Torres's supervision was deficient in either scenario because Torres (1) knew when the first floor was tested the situation was "[n]ot like last year" and there was likely an electrical problem relating to the source of the electricity; knew if the grid's power was not restored on each floor the UPS would eventually be depleted; knew if the UPS was depleted and the power failed, it could have serious implications for the ICU patients' safety; but, seemingly, took no significant action to investigate or remedy this potential problem; and (2) failed to ensure the grid's power was or would be restored on each floor.  These failures exposed the ICU tower's data rooms to potentially serious consequences, which in fact materialized.

In his e-mailed report to Rojas on the EPO test's results, Torres's account of what happened during the test is confusing and misleading, and demonstrates his incompetence during the testing.  For example, Torres says on each floor he "had to note the [s]hunt trip failed" when the power remained on after the EPO system was triggered, yet there is nothing in the record that shows Torres actually checked the shunt trips himself to confirm they had "failed"; if he had checked, he would have seen that the shunt trips had not failed and needed to be reset.  This statement also directly contradicts his later emphatic deposition testimony that he made sure the shunt trip was reset on each floor before continuing to the next floor.[7]  Confirming that Torres in fact did not check the shunt trips on each floor, Torres told Rojas it was only *after* Munoz received reports from the ICU nurses that the data rooms were powerless that Torres realized the shunt trips had in fact worked (stopping the power supply from the grid), that the UPS which had been supplying power was now depleted, and that the shunt trips needed to be reset to restore

---

[6] Torres also stated that electricians had not participated in the tests in the past, suggesting that electrician participation was not necessary to a successful test (as he claims it was) and others on the EPO test team knew the location of the shunt trip breakers.

[7] This testimony is suspect because if the shunt trip had been reset on each floor, in theory the power from the grid should have been restored to each floor.

the grid's power.[8]  As another example, despite representing that "Munoz was in constant communication with us," Torres also said, "Since we [were told] the fire alarm and EPO supervisory signals were received and the fire alarm system was reset" after the first floor was tested, "we went on to another location"; if Torres and Munoz really had been in communication throughout the duration of the test, Munoz would have told Torres that the power from the grid remained off on each floor and needed to be restored.  Finally, Torres's e-mail fails to convey the severity of the situation, including that some data rooms were powerless for more than an hour.

Poore was not on site during the EPO testing.  Nor was he required to be, asked to be, or had been in years past.  Torres did not call Poore during the fiasco nor did he report the results of the failed test to Poore (he reported them to Rojas, and cc'd Poore on the e-mail).  Nothing in the record suggests Poore played any significant role in assembling or supervising the testing team, establishing the testing protocol, supervising the on-site test, or remedying the problem.

Given the situation, Rojas, logically, surmised Torres was ultimately at fault for the power failure.  At the direction of a Cedars-Sinai vice president, Rojas ordered an investigation into the incident to confirm his suspicion.  Nothing in the investigation exonerated Torres and, in Rojas's opinion, the reports confirmed his suspicion that Torres was to blame for the serious power outage.

In defense, Torres submitted statements from his and former Cedars-Sinai electrician Edgar Melgoza's declarations.  Torres stated he did not have the technical knowledge required to run every aspect of the EPO test.  That is irrelevant; as a supervisor, he was not required to have such detailed knowledge.  He was required, however, to ensure the EPO testing team was composed of individuals who collectively

---

[8] Torres wrote in his e-mailed report to Rojas, "after getting information [from Munoz] that power failed inside each of the [data rooms] after 15 minutes of activation of [the] shunt [trips because the EPO system had been triggered, shutting off the grid's power], we realized that the battery power from the UPS that feeds these [Network] systems [to the data rooms] were still giving electrical power to these systems."

had and applied that knowledge. He failed either because, as he claims at points, no one on the team knew where the shunt trip breakers were or failed because he did not confirm whoever had that knowledge reset the shunt trips and restored the grid's power on each floor. Equally unavailing are Torres's statements about Poore's level of involvement in, and Torres's level of disengagement from, the planning of the EPO testing. The evidence shows Torres was, *at a minimum*, aware of the EPO test planning and in communication with the other parties involved in organizing it, especially Poore. If Poore were organizing the EPO test in an unsatisfactory way, it was Torres's responsibility, not Poore's, to correct the errors. As to Melgoza's statements, he admitted the EPO test was not part of his responsibilities, he had no personal knowledge of the EPO testing procedures, he did not help plan the test, and he was not present during the test. Due to Melgoza's lack of personal knowledge, we agree with the trial court that his statements regarding the EPO testing should be disregarded.

There was more than enough evidence for the trial court and us to conclude, even without considering Torres's other employment infractions, that the failed EPO test was a legitimate basis for Cedars-Sinai to terminate Torres.

### 3. Torres failed to present substantial evidence that his termination was a pretext

Once Cedars-Sinai rebutted the discrimination presumption, it "disappear[ed]" and the burden shifted again to Torres to demonstrate pretext. (*Guz*, *supra*, 24 Cal.4th at p. 356.) Although Torres attempted to present evidence that the EPO test failure was a pretext for his racially motivated termination, he did not present substantial admissible evidence Rojas is a racist and that is the reason why Torres was fired.

One of Torres's primary accusations of Rojas's racism is a comment Melgoza allegedly heard Rojas make. "Stray comments" "are to be considered *along with all the other evidence* in the record in determining whether a rational inference of discrimination exists." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 867 (*Serri*), italics added; *Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 320 [rejecting the old stray comments doctrine which allowed categorical dismissal of certain remarks]; *Reid v.*

13

*Google, Inc.* (2010) 50 Cal.4th 512, 541 (*Reid*) ["a totality of the circumstances analysis successfully winnows out cases 'too weak to raise a rational inference that discrimination occurred'"]; see also *Guz*, *supra*, 24 Cal.4th at p. 362.)  Melgoza claims in his declaration he once heard Rojas refer to a group of workers at Cedars-Sinai as the "Asian gang." Melgoza previously stated in his deposition, however, that Rojas referred to the group as the "Chinese gang," a class to which Torres does not belong.

Generally, deposition testimony will control over declaration testimony. "Admissions or concessions made during the course of discovery govern and control over contrary declarations lodged at a hearing on a motion for summary judgment." (*Visueta v. General Motors Corp.* (1991) 234 Cal.App.3d 1609, 1613 (*Visueta*); *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 20–22 (*D'Amico*).)  If we accepted the deposition version of the comment, it would be disregarded because evidence of discrimination against other classes is irrelevant in employment discrimination actions. (*Hatai v. Department of Transportation* (2013) 214 Cal.App.4th 1287, 1297–1298 (*Hatai*) [evidence of discrimination against different classes of persons properly excluded under Evid. Code, § 352], disapproved on other grounds in *Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97.)  Regardless of the exact language, there are several reasons why the statement should be disregarded in any case. (*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 482 [where deposition statement ambiguous, *D'Amico* rule should be applied with caution], overruled on other grounds in *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1179, 1182.)

To start, Torres failed to show the comment was made while he was employed by Cedars-Sinai.  Melgoza was employed by Cedars-Sinai from May 16, 2011, to June 30, 2013.  Torres was fired March 9, 2012.  Torres does not show Rojas made this comment during the time Melgoza's and Torres's employment overlapped.  Similarly, Torres does not allege he was even aware of the comment at any point prior to this litigation.  In addition, the comment was not made to or about Torres and Torres, as a supervisor, was not part of the group of referenced workers.  Moreover, neither Torres nor Melgoza

14

alleges Rojas said it in a derogatory manner or explains how, exactly, this comment shows Rojas's animus toward Asians.[9] In fact, the only evidence in the record related to this claim is two declarations from Chinese workers, who were part of the referenced group, stating they feel Rojas has never treated them unfairly because of their race or ethnicity. This comment "[a]t best, even when examined in the aggregate, . . . raise[s] only a weak suspicion that discrimination was a basis for" Torres's termination. (*Serri*, *supra*, 226 Cal.App.4th at p. 868.) An isolated comment, which (1) may not have been made during the period of employment, (2) was not made about or in the presence of Torres, (3) was directed at a group to which Torres did not belong, and (4) is contradicted by the only other related evidence in the record is not sufficient evidence that Rojas was racist against Asians and that that racism caused him to fire Torres. "Certainly, who made the comments, when they were made in relation to the adverse employment decision, and in what context they were made are all factors that should be considered." (*Reid*, *supra*, 50 Cal.4th at p. 541.)

Torres attempts to bolster his animus claim with other evidence of Rojas's racism. All of Torres's remaining evidence, however, is inadmissible or should be disregarded.

First, Torres submitted a document purportedly written by a group of Rojas's subordinates, none of whom Torres claimed are Asian, recounting why they believed Rojas to be a racist. This document, however, was not produced during discovery, was never authenticated, and Torres's counsel refused to say how he had acquired it. Torres also did not attempt to argue that it shows Rojas is racially biased against Torres's class. Because this document was not authenticated and does not show Rojas is a racist against Asians, it is inadmissible under Evidence Code sections 350, 1400, and 1401.[10]

---

[9] Because this statement, even if believed, does not prove animus, it is not direct evidence of Rojas's alleged racism, as Torres claims. (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 550 ["Direct evidence is evidence which, if believed, proves the fact of the discriminatory animus without inference or presumption"].)

[10] Undesignated statutory references are to the Evidence Code.

15

Second, Torres submitted additional statements made by Melgoza in his declaration about Rojas's alleged discrimination.  For example, Melgoza stated Rojas asked him to discriminate against an East Indian subordinate, and, when Melgoza refused, Rojas retaliated against him.  This evidence is irrelevant, however, because Torres, an Asian, and the subordinate, an East Indian, are of different protected classes; because this evidence is irrelevant, we disregard it.  (*Hatai*, *supra*, 214 Cal.App.4th at pp. 1297–1298.)  Melgoza also stated Rojas made discriminatory comments about workers over the age of fifty.  These statements are likewise irrelevant, and disregarded, because Torres does not claim Rojas discriminated against him because of his age.  (*Ibid*.)  Melgoza also alleged Rojas subjected workers of "foreign descent, specifically if they had a pronounced foreign accent," to unwarranted discipline.  Again, this evidence is irrelevant, and disregarded, because Torres does not claim Rojas discriminated against him because of an accent.[11]  (See, e.g., *Planned Parenthood v. City of Santa Maria* (1993) 16 Cal.App.4th 685, 690–691 ["the pleadings define the issues for summary judgment and summary adjudication"].)

Third, Torres submitted the declaration of Timothy Holland (Holland) which alleged Rojas was a bad manager and a liar.  Holland's declaration, however, does not allege Rojas was racist against Asians and is therefore, likewise, inadmissible under section 350.

Fourth, Torres similarly submitted Melgoza's statements that Rojas generally treated him and other employees poorly.  Torres fails to show, however, how this treatment is related to Rojas's alleged racism or Torres's termination.  These other complaints are therefore likewise inadmissible under section 350.

---

[11] Torres, dozens of pages into his opening appellate brief, merely states:  "It is well settled that accent and national origin are inextricably intertwined in many cases, and the law recognizes such as national origin discrimination."  In support, he cites to one Ninth Circuit and one Sixth Circuit case.  This one sentence can hardly be characterized as an argument, especially in light of the fact that Torres does not argue this accent claim anywhere else, including in his complaint.

Fifth, and finally, Torres offers some of his own statements about Rojas's alleged racism. We disregard Torres's statements, however, because they are directly contradicted by his deposition testimony. (See *Visueta*, *supra*, 234 Cal.App.3d at p. 1613; *D'Amico*, *supra*, 11 Cal.3d at pp. 20–22.) Torres states that although Rojas has never done or said anything racist in his presence, he believed Rojas to be racist against him. He believed this because, according to him, for example, Rojas tried replacing him with Poore. Torres admitted, however, in his deposition to being continually responsible for all his contractual employment obligations while employed by Cedars-Sinai. Torres also stated that he heard from others that Rojas "had problems" with him taking a four-week leave of absence to the Philippines to attend to business and visit his son. Torres admitted, however, he had no business in the Philippines and has no son. He also did not attempt to demonstrate how Rojas's refusal to allow him to take a leave of absence shows Rojas's animus. Torres further stated Rojas's poor reviews of him in later years demonstrate Rojas's racism. Torres conceded, however, he had received similar negative reviews from a different supervisor in the past, but Torres did not think those reviews were motivated by racism. Torres also said his required "performance counseling" was motivated by Rojas's racism even though employees of other races, according to him deservedly, received identical counseling for what was seemingly a widespread employment issue.

Torres also said he felt some comments Rojas made about other employees, some of whom were Filipino, were motivated by racism. These comments (e.g., an employee would be "eaten alive" if promoted) appear to be unrelated to animus and Torres failed to attempt to demonstrate how they are tied to animus. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1118 ["mere speculation" of discrimination is insufficient to sustain discrimination action].) Torres also claims Rojas unfairly fired and forced certain employees to retire. He admitted, however, that the employees were all of different races; again, we disregard this type of evidence as irrelevant. (*Hatai*, *supra*, 214 Cal.App.4th at pp. 1297–1298.) Finally, some of Rojas's alleged behavior Torres says demonstrates his animus is either unrelated to racism or does not prove discrimination

17

(e.g., Rojas was in a position of hierarchical superiority to Torres; Rojas and Torres are of different ethnicities).  (*Guthrey*, at p. 1118.)

Torres's lone, and problematic, allegation that Melgoza once heard Rojas refer to a group of employees as an "Asian gang" is insufficient to show Cedars-Sinai's reason for Torres's termination was a pretext.  In light of the danger Torres exposed Cedars-Sinai's ICU patients to by failing to ensure the Network remained operational before, during, and after the EPO testing, we find summary adjudication for Cedars-Sinai on the wrongful termination count was proper.

## B.    Torres failed to establish discrimination

As described above in part II.A.2., Torres failed to establish Rojas acted discriminatorily toward him or that racial animus motivated his termination.  Torres does not allege any other discrimination.  We agree with the court's grant of summary adjudication on Torres's discrimination claim.

## C.    Torres abandoned his FEHA harassment claim

Torres conceded at the summary judgment hearing he was abandoning his FEHA harassment claim.  He cannot, nor does he try, to raise it on appeal.

## D.    Torres's derivative claims for wrongful termination in violation of public policy likewise fail

Torres's claim for wrongful termination in violation of public policy is "tethered" to his discrimination and harassment claims.  (See *Estes v. Monroe* (2004) 120 Cal.App.4th 1347, 1355.)  Because his discrimination and harassment claims failed, so does his claim for wrongful termination in violation of public policy.  (*Hanson v. Lucky Stores* (1999) 74 Cal.App.4th 215, 229.)  We agree with the trial court's grant of summary adjudication.

## E.    The statute of limitation bars Torres's defamation claim

Torres claims Cedars-Sinai remains liable for allegedly defamatory statements made in Torres's 2012 termination memorandum.  Torres filed his complaint on April 29, 2013.  Under Code of Civil Procedure section 340, subdivision (c), any statements made before April 29, 2012, are barred.  Cedars-Sinai issued Torres's termination

18

memorandum on March 9, 2012. Torres's termination memorandum was outside the one-year period and his claim is therefore time barred.

Torres argues his claim is excepted from the time bar under the self-publication doctrine. He claims he must disclose, or publish, the termination memorandum's contents when he applies for new jobs, which Cedars-Sinai should have reasonably anticipated. Self-publication applies in this context, however, only when the plaintiff is under a "strong compulsion" to "explain away a negative job reference." (*Davis v. Consolidated Freightways* (1994) 29 Cal.App.4th 354, 373, italics omitted.) Torres failed to demonstrate that Cedars-Sinai gave him a negative job reference or has disclosed the reasons for his termination anywhere other than in the internal termination memorandum. He has likewise failed to show he has otherwise been strongly compelled by prospective employers to reveal the exact reasons for his termination. His claim is not excepted and therefore is time barred.

## DISPOSITION

The judgment is affirmed. Cedars-Sinai is awarded its costs on appeal under California Rules of Court, rule 8.278.

NOT TO BE PUBLISHED.


LUI, J.

We concur:


CHANEY, Acting P. J.


JOHNSON, J.


19