Filed 5/19/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ARNETTE TRAVIS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BILL BRAND et al., <br><br> Defendants and Respondents; <br><br> REDONDO BEACH WATERFRONT, LLC, et al., <br><br> Appellants. | B298104 <br><br><br> Los Angeles County <br> Super. Ct. No. BC665330 |
| ARNETTE TRAVIS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BILL BRAND et al., <br><br> Defendants and Respondents. | B301479 <br><br> Los Angeles County <br> Super. Ct. No. BC665330 |

APPEAL from an order of the Superior Court of Los Angeles County, Malcolm H. Mackey, Judge. Reversed.

Shumener, Odson & Oh, Betty M. Shumener, John D. Spurling, and Daniel E. French for Plaintiffs and Appellants Arnette Travis and Chris Voisey.

Stevan Colin for Defendants and Respondents Bill Brand, Brand for Mayor 2017, and Linda Moffat.

Jeanne L. Zimmer for Defendant and Respondent Nils Nehrenheim.

Law Office of Bobak Nayebdadash and Bobak Nayebdadash for Defendants and Respondents Wayne Craig and Rescue Our Waterfront P.A.C.

_____

In a case on remand from our Supreme Court, we hold the defendants and respondents are not entitled to an award of attorney fees. We apply two statutory attorney fee provisions: the Political Reform Act of 1974 (Gov. Code, § 81000 et seq. (the Act); § 91003, subd. (a)), as well as Code of Civil Procedure section 1021.5.

This matter is, one hopes, the final stage of a lawsuit about an electoral campaign in 2016 and 2017. Supporters of a local measure succeeded at the ballot box, but thereafter opponents of the measure sued them for campaign disclosure violations. In an earlier decision, we held the prevailing defendants were entitled to attorney fees under the Act, whether or not the plaintiffs had a foundation for bringing the case. (*Travis v. Brand* (2021) 62 Cal.App.5th 240, 263–264 (*Travis I*).)

The Supreme Court granted review and reversed: a prevailing defendant may recover attorney fees under the Act only if the plaintiff brought or maintained the suit without

2

foundation.  (*Travis v. Brand* (2023) 14 Cal.5th 411, 427–428 (*Travis II*).)

We now revisit the attorney fee issue and reverse the trial court's fee award and our previous result.  Although the plaintiffs lost at trial, they marshaled a foundation for their suit and, according to the Act, thus now avoid the bill for the other side's lawyers.  A second basis for a fee award—Code of Civil Procedure section 1021.5—is inapplicable because this suit neither enforced an important right affecting the public interest nor conferred a significant benefit on the general public.

Unless otherwise noted, citations are to the Government Code.

I

Our statement of facts is long and detailed by necessity.  Our first job is to determine whether this lawsuit had a foundation in the facts.  The facts involve a considerable cast.

A

We introduce the actors according to their attitudes about a proposed redevelopment of the Redondo Beach waterfront.  (See *Redondo Beach Waterfront, LLC v. City of Redondo Beach* (2020) 51 Cal.App.5th 982, 986–990.)  Forces opposing the redevelopment backed a Measure C.  Those favoring redevelopment opposed Measure C.  Voters passed Measure C in 2017.  (*Id.* at p. 990.)

We generally call those favoring Measure C the Supporters and those against it the Opponents.  In a nutshell, after the election, the Opponents sued the Supporters but lost at trial.

Now we populate these two sides—Opponents and Supporters—with individuals.

The Opponents, Arnette Travis and Chris Voisey, were against Measure C because they favored the redevelopment project. They were the plaintiffs and appellants in this action. They sued the Supporters of Measure C, which curtailed the redevelopment.

The Supporters included a political action committee and two municipal officials. The political action committee was Rescue Our Waterfront P.A.C. (Rescue). The officials were Redondo Beach Mayor Bill Brand and Redondo Beach City Councilmember Nils Nehrenheim.

The Opponents also sued Wayne Craig, the principal officer of Rescue; Brand's mayoral campaign committee; and the committee's treasurer, Linda Moffat.

All these defendants—Rescue, Brand, Nehrenheim, Craig, the campaign committee, and Moffat—are now respondents in this appeal. We generally refer to all of them as the Supporters.

When the Opponents lost at trial, the court entered judgment and awarded attorney fees against them. They appealed the judgment and the fees.

Redondo Beach Waterfront, LLC (Waterfront), Fred Bruning, and Jean Paul Wardy also appealed the judgment. Bruning and Wardy were the principals for Waterfront and for CenterCal Properties, LLC (CenterCal). CenterCal is a developer the City of Redondo Beach selected in 2012 for proposed redevelopment of the city's waterfront. We call Waterfront, Bruning, and Wardy collectively the Nonparties.

4

B

We summarize aspects of Redondo Beach's March 7, 2017 election, which resulted in electoral victories for Measure C, Brand, and Nehrenheim.

On June 28, 2016, Craig, Nehrenheim, and one Martin Holmes submitted a "Notice of Intent to Circulate Petition" to the city of Redondo Beach seeking to place a local initiative—later designated Measure C—on the ballot for the next election. They succeeded: Measure C indeed was on that ballot. Measure C aimed to limit waterfront development.

On July 1, 2016, Craig and Holmes signed a "Statement of Organization" form designating Rescue as a *primarily formed* committee and listing the measure Rescue was primarily formed to support. Craig and Holmes also designated Rescue as a *general purpose* committee on the form and left the *controlled committee* section blank, indicating Rescue was not candidate controlled. The Secretary of State rejected the form because Rescue could be primarily formed, or general purpose, but not both.

These classifications—"*primarily formed*," "*general purpose*," and "*controlled*"—are statutory terms of art unfamiliar to a general audience, but they are fundamental to the merits of this case.

Later we define these classifications more comprehensively, but for now we note that primarily formed committees support or oppose a single candidate, single measure, multiple candidates in a single election, or multiple measures in a single election. (§ 82047.5.) General purpose committees support or oppose more than one candidate or ballot measure. (§ 82027.5.) There is some overlap in the definitions, but if a committee meets the primarily

5

formed criteria, it is not general purpose.  (See *id.*)  Either type of committee may also be candidate-controlled, which means a candidate has significant influence over the committee. (§ 82016.)

The main disclosure in this case was in the committee name.  Committees *primarily formed* to support or oppose a measure must say so in their name, for example "No on Measure A," or, of more relevance, "Yes on Measure C."  (See § 84107; Cal. Fair Pol. Practices Com., Committee Naming Requirements, at <https://www.fppc.ca.gov/content/dam/fppc/NS-Documents/TAD/Campaign%20Documents/Committee_Naming_Requirements.pdf> [as of March 17, 2021], archived at <https://perma.cc/8VBH-G8GP>.)  Similarly, a *controlling* candidate's name is part of the committee's name.  (Cal. Code Reg., tit. 2, § 18521.5.)

We return to Rescue.  Craig and Holmes corrected and resubmitted Rescue's Statement of Organization form in August 2016.  They designated it a *general purpose* committee.  They described their plan for Rescue's activities on the form:  "Support candidates & ballot measures to preserve the Redondo Beach Coastal zone and related activities."  Craig and Holmes again left the *controlled committee* section blank, indicating Rescue was not candidate *controlled*.

Voters favored Measure C in the March 7, 2017 election. Brand won his bid for mayor.  Nehrenheim qualified for a run-off election and later won a seat on the city council.

6

## C

After the election, on June 15, 2017, the Opponents filed a complaint alleging the Supporters violated the Act and related regulations.

The complaint included two main issues, both related to the March 7, 2017 election and Measure C.

The first issue was about Rescue's purpose. The Opponents alleged Rescue was not a general purpose committee but rather a primarily formed committee that its founders created to support Measure C. The Opponents contended the law thus required Rescue, as a primarily formed committee, to include words like "Yes on Measure C" in its name. Additionally, Rescue could not have categorized expenditures to support Measure C as independent expenditures.

The second issue was about whether Brand and Nehrenheim controlled Rescue. The Opponents alleged Brand and Nehrenheim "exerted significant influence and control over" Rescue and were "controlling candidates." According to the Opponents, the candidates improperly "failed to disclose [their] controlling candidate status on their campaign reports."

The Opponents sought injunctive relief compelling the Supporters to comply with the Act.

The Supporters moved for summary judgment. The court found there were triable issues of material fact and denied summary judgment.

A five-day bench trial began November 14, 2018. We summarize this 11-witness trial.

Travis and Voisey testified they were residents of Redondo Beach and followed local politics.

Craig, principal officer and treasurer of Rescue, formed Rescue with Holmes. He testified they intended Rescue to support multiple activities, candidates, and ballot measures related to the Redondo harbor area. Selecting both "primarily formed" and "general purpose" on Rescue's initial Statement of Organization form was simply an error.

Craig said Rescue did a "huge number of things" to support Measure C. It paid to publish its title, summary, and notice in a local newspaper; it printed petitions; and it paid for signature gatherers to circulate the petitions. It also paid for yard signs, door hangers, and mailers in favor of Measure C. Rescue and its volunteers knocked on doors and made phone calls in favor of Measure C.

Craig said no candidate ever directed or controlled Rescue. Rescue distributed a mailer that supported Measure C and four candidates, including Brand and Nehrenheim. Rescue had a fundraiser with Brand and Nehrenheim in November 2016, but Craig "didn't have any conversations" with Brand and Nehrenheim leading up to the event.

Nehrenheim and Brand testified. They denied having control or significant influence over Rescue, but they admitted involvement with and support for Measure C.

According to his resume, Nehrenheim was a "Co-writer" of the initiative that became Measure C. He testified he had a role in writing the measure by gathering information from the community. Both candidates helped collect signatures in support of placing the measure on the ballot. Nehrenheim's campaign literature promoted Measure C. Brand placed newspaper advertisements in support of Measure C.

Brand shared with Rescue his subscription to an online program that provides information about voters. That program charged Brand if a user selected a voter population. Brand gave Rescue access, but "didn't talk to them about it." Brand did not require Rescue to reimburse the charges it accrued. Brand disclosed these charges as non-monetary contributions to Rescue.

Ann Ravel testified as an expert for the Opponents. She chaired the California Fair Political Practices Commission (the Commission) between 2011 and 2013. She concluded Rescue was primarily formed. This was based on Rescue's activities in support of Measure C as well as the proportion of Rescue's spending that was for the measure. Ravel also concluded Brand and Nehrenheim were controlling candidates of Rescue.

After the Opponents rested, the Supporters moved for nonsuit. The court denied this mid-stream effort to end the trial: "This is not the type of case. I need further evidence."

The Supporters called Travis and Voisey a second time and asked about the lawsuit's funding. As of trial, Travis had not paid anything to prosecute the case and said she did not know the payment arrangement she had with her lawyers. Like Travis, Voisey said he had not paid any court-related costs. He said he was not aware of arrangements in which anyone promised to pay to prosecute the case.

An expert testified for the Supporters. She disagreed with Ravel. She believed Rescue was a general purpose committee and neither Brand nor Nehrenheim controlled it. She conceded that at the end of 2016, Rescue had reason to know almost all of its political expenditures were in support of Measure C. She said Rescue originated as a general purpose committee and did not need to change its status to primarily formed, though, because it

9

did not meet a total spending threshold and because the election was over.

The Supporters called the Opponents' attorney, Bradley Hertz, to testify. Over the Opponents' objection, the court allowed the Supporters to ask him about the lawsuit's funding. Hertz said his clients were Travis and Voisey, but Waterfront, a company whose principals were involved in the proposed waterfront redevelopment, was paying for the lawsuit.

After Hertz testified, Brand's attorney moved to dismiss the lawsuit. Counsel argued Waterfront was the real party in interest and it lacked standing. The court denied the motion and said, "[w]e'll face the real issues on the case."

At the end of the trial, the court made oral findings in favor of the Supporters.

The Opponents declared they could not afford legal fees and costs and had given informed written consent for Waterfront to fund the litigation on their behalf before they filed the case.

The court entered judgment in favor of the Supporters. The judgment included several findings. Rescue was formed as a general purpose committee, never became a primarily formed committee, and was not a controlled committee. The court ruled none of the Supporters needed to amend their campaign statements or forms.

The court made additional findings about the Opponents. They were " 'shills' for [the Nonparties] . . . who initiated the instant lawsuit against the [Supporters] and directed and financed the prosecution of this case against each of the [Supporters]." The court entered the judgment not only against the Opponents but also against the Nonparties.

10

The court signed a statement of decision reflecting these findings. The court found the Supporters and their expert witness to be credible.

The court awarded the Supporters $862,736.60 in attorney fees against the Opponents. This award was pursuant to the Act and Code of Civil Procedure section 1021.5. This is the ruling at issue today.

The Opponents and the Nonparties appealed the judgment. The Opponents also appealed the attorney fees. We consolidated the appeals.

In our earlier opinion, we held the Nonparties had standing to appeal the judgment, the court erred by entering judgment against them, and substantial evidence supported the court's findings that Rescue was a general purpose committee and was not a controlled committee. (*Travis I*, *supra*, 62 Cal.App.5th at pp. 255–263.) The Supreme Court's review was not about those holdings.

The trial court granted attorney fees to the victorious defendants: the Supporters. Our first opinion held the Act gave the trial court authority to award attorney fees to these defendants irrespective of whether the plaintiffs had a foundation for bringing the case. (*Travis I*, *supra*, 62 Cal.App.5th at pp. 263–264.)

The Supreme Court reversed on that issue: a prevailing defendant may recover attorney fees under the Act only if the plaintiff brought or maintained the suit without foundation. (*Travis II*, *supra*, 14 Cal.5th at pp. 427–428.) The high court remanded for us to determine whether the Supporters demonstrated the lawsuit was objectively groundless or,

11

alternatively, whether Code of Civil Procedure section 1021.5 supported the award. (*Id.* at p. 428.)

II

We reverse the trial court's award of attorney fees because it violates both the Act and Code of Civil Procedure section 1021.5. The standard of review for fee awards is abuse of discretion. (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.) Our review is independent when we construe statutory requirements for a fee award. (*Ibid.*) The Opponents must show error. (See *Laffitte v. Robert Half International Inc.* (2016) 1 Cal.5th 480, 488.)

A

The award was not proper under the Act. Under *Travis II*, *supra*, 14 Cal.5th at pages 427–428, a prevailing defendant is entitled to fees only if the court finds the action was objectively without foundation when the plaintiffs brought it, or the plaintiff continued to litigate after it clearly became so. The trial court found the lawsuit was frivolous and groundless. This finding lacks support. The court abused its discretion by awarding fees under the Act.

The trial court explained its finding as follows: "As I already decreed, the [Opponents] were shills for [] Waterfront; that the [Supporters] acted in good faith; that Rescue [] was always a general purpose committee; and that Brand and Nehrenheim do not control or significantly influence the actions of [Rescue]. . . . [The Opponents] attempted to punish [the Supporters] because of their free-speech rights exercised in publicly supporting Measure C on the city's ballot, and [the Supporters'] support for Measure C was to guard against a 525,000-square-feet encroachment on the city's waterfront in

12

Santa Monica Bay; and the people voted, along with the [Supporters], to reject this project. So the Court finds that the suit was frivolous, and that's my ruling."

The trial court's statement concentrates on motive, not foundation. Motive and foundation are quite different. You can have a vile motive for bringing a valid suit: you might subjectively loathe and envy the defendant, *but* your suit can be legally correct and fully supported by the evidence. Conversely, you can have lofty motives for baseless litigation: you can be pure of heart but legally inept. So a particular motive does not negate foundation. Neither does outside funding. Under the *Travis II* standard, the trial court's rationale for its ruling was incorrect.

That does not settle the matter by any means, for we review results and not reasoning. In other words, we do not reverse a correct result because a court gave an incorrect reason for it. We must go further to determine what the right legal result is on these facts.

The right result under *Travis II* is that the Opponents owe no fees because they had ample support for the lawsuit they filed. These plaintiffs had a foundation for their case at the outset and throughout the proceedings.

To size up the foundation for a case, we scrutinize the law, and then the facts that this law makes material. We start with the law.

Section 82047.5 provided that Rescue would be a primarily formed committee if it were formed, or it existed, primarily to support or oppose a single measure, such as Measure C. In contrast, it would be a general purpose committee if it were

formed or existed primarily to support or oppose more than one candidate or ballot measure.  (§ 82027.5.)

Regulations specify three ways a committee can be formed or exist primarily to support or oppose a measure.  These are:  (1) the committee was created for or is involved in the primary campaign for a measure; (2) the committee's primary purpose and activities are for the measure; or (3) over 70 percent of the committee's contributions and expenditures go to the measure.  (Cal. Code Reg., tit. 2, § 18247.5, subd. (c).)  A general purpose committee must change its status to primarily formed if it meets one of the three requirements and it makes at least $10,000 in contributions or expenditures for a local measure.  (*Id.*, subd. (f)(2).)

A committee can be candidate-controlled under either of two analyses:  (1) the candidate directly or indirectly controls the committee or (2) the candidate acts jointly with the committee in making expenditures.  (§ 82016.)  Candidates control a committee if they have "a significant influence on the actions or decisions of the committee."  (*Ibid.*)

The lawsuit had foundation.  This conclusion follows from three sources:  actions and testimony of the Supporters, testimony of the Opponents' expert, and the court's rulings throughout the case.

The Supporters' actions and testimony created a factual foundation.  Craig originally submitted a Statement of Organization form designating Rescue as both "*Primarily Formed*" and "*General Purpose.*"  Craig said this initial selection was merely an error and the trial court found him credible.  The Opponents certainly were entitled, however, to believe and to argue the reasonable inference that Craig originally selected

14

"*Primarily Formed*" because Rescue *was* primarily formed to campaign for Measure C.

Other facts supported the notion that Rescue was created for, or involved in, the primary campaign for a measure, or that its primary purpose and activities were for Measure C. Craig testified about the "huge number of things" Rescue did to support Measure C. Publishing a measure's title, summary, and notice, printing petitions, paying for signature gatherers, paying for yard signs, door hangers, and mailers, and knocking on doors and making phone calls in support of a measure are all things one would expect a primarily formed committee to do. And the Supporters' expert said Rescue had reason to know, at the end of 2016, almost *all* of its political expenditures were in support of Measure C.

Some of the Supporters' testimony likewise contributed to the suit's foundation by suggesting Brand and Nehrenheim made joint expenditures with Rescue or controlled Rescue. The candidates had a fundraiser with Rescue. Brand gave Rescue free access to his subscription to an online program that provides information about voters. Like Rescue, the candidates heavily promoted Measure C. Nehrenheim helped co-write it. Rescue and both candidates gathered signatures to place the measure on the ballot. Nehrenheim's campaign literature and Brand's newspaper advertisements supported Measure C. One reasonable inference is the candidates and Rescue merely shared a goal. Another is that this coordination amounted to candidate control of Rescue.

The Opponents did not win the trial, but they had a factual foundation for their claims.

15

The Opponents' expert's opinion also poured a foundation of law for their case. This expert, a former chair of the Commission, opined Rescue was a primarily formed committee and Brand and Nehrenheim were controlling candidates. The trial court did not oust this expert under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 772. Some "expert" opinions are clearly invalid and unreliable. (*Ibid.*) This expert opinion had more going for it than that. It provided a foundation.

Court rulings also reveal the strength of this foundation. The trial court denied the Supporters' request for summary judgment, denied nonsuit after the Opponents rested at trial, and denied dismissal after Hertz testified about the funding. These rulings signal the case had some factual and legal support.

The Supporters' counterarguments are incorrect.

Some of the Supporters' arrows fly far wide of the target. They argue the Opponents were "motivated" by "hatred of [the Supporters] and their political views and their continued verbalization of those views" and substantial evidence supported the judgment. Motive and outcome do not prove lack of foundation.

The Supporters say the Opponents knew Rescue was a general purpose committee because Rescue corrected its Statement of Organization form to say so. But the Opponents thought the correction was erroneous and they sued to prove it. Their suit had a foundation.

Finally, the Supporters incorrectly argue a 2010 Commission letter shows the Opponents' suit lacked foundation.

We describe this letter, which offered "informal assistance." The Commission advised that, if a general purpose committee reaches spending thresholds only after an election ends, the

16

committee need not change its status to primarily formed even if it otherwise meets the requirements for changing its status. The letter also explained Commission staff would examine whether to make the regulation "more prospective" so committees in that situation would have to change to primarily formed *before* the election.

The 2010 informal assistance letter did not affect the case's foundation. The letter, from seven years before the Opponents filed suit, predicted a potential change in rules. The letter is not law. Nor would it have been decisive had it been law. The Opponents argued in part that Rescue was primarily formed from the start. The issue of *changing* from general purpose to primarily formed committee was irrelevant to that argument. Furthermore, this letter did not address the candidate-controlled issue. Arguments from this letter do not win the day.

In sum, the court abused its discretion by awarding fees under the Act.

## B

We turn to the second basis for the fee award.

The court abused its discretion by awarding attorney fees under Code of Civil Procedure section 1021.5—the so-called "private attorney general fees." The court ordered these fees on the basis of a faulty free speech argument. On appeal, the Supporters reiterate this flawed argument. They also raise new arguments, but these too are erroneous.

A party must satisfy four elements to earn private attorney general fees. In shorthand, the elements are: (1) the party enforces an *important right affecting the public interest*; (2) the party confers *a significant benefit to the general public or a large class of people*; (3) an award is appropriate because private

enforcement was necessary and financially burdensome; and (4) fees must not be paid out of a recovery. (Code Civ. Proc., § 1021.5; *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 934–935 (*Woodland*).)

The first two elements are missing from this case, so we do not address the third. There was no monetary recovery, so the fourth element does not apply.

The first two elements require a practical analysis. For element one, trial courts must "realistically" assess the litigation and determine, from a "practical perspective," whether the action vindicated an important right. (*Woodland*, *supra*, 23 Cal.3d at p. 938.) For element two, trial courts must make a "realistic assessment" of the significance of the benefit and the size of the class receiving the benefit. (*Id.* at pp. 939–940.)

We begin with the court's rationale for its fee award. With our emphases, the court's order asserted the successful defense "resulted in the enforcement of *an important right* affecting the public interest which has been conferred on the general public by the [Supporters]." The order's reasoning, which seems to apply both to the Act basis and the private attorney general fees basis, stated the Opponents were "shills" who brought the lawsuit to "punish" the Supporters for exercising their *free speech* rights to support Measure C. The court also said the Supporters were "guard[ing]" against a "525,000-square-feet encroachment on the city's waterfront." The court likewise noted voters favored Measure C.

On appeal, the Supporters rephrase these free speech points in arresting prose: the Opponents "trampled on the Constitutional rights of an untold number of people in the state" by trying to "silence" and "punish" the Supporters for exercising

18

their speech rights of "transparently advocating" their support for less development and slower growth.

Actually, this case was not about free speech. Everyone in the campaign said whatever they pleased. It was a lively fountain of free speech. The lawsuit had nothing to do with speaking freely: it neither constricted nor enlarged the fountain's flow. Rather, the Supporters avoided changing the committee name to "Yes on Measure C" or something similar and avoided disclosing that Brand and Nehrenheim were backing the committee.

The Opponents' suit aimed, not to suppress speech, but to promote what they believed were proper campaign disclosures. They lost, as the trial court ruled and as we affirmed. (See *Travis I*, *supra*, 62 Cal.App.5th at pp. 257–262.)

But their lawsuit's legal issues were narrow: what was a political committee's purpose, and did Brand and Nehrenheim control the committee? These questions did not put freedom of speech on trial.

The public at large did not know and did not care about the issues the court adjudicated. Nothing in the record demonstrates even minimal public interest in these obscurities. Practically and realistically, important rights affecting the public interest were nowhere to be seen. (See *Woodland*, *supra*, 23 Cal.3d at p. 938.) The claim for fees fails element one of the test.

The Supporters seek, unsuccessfully, to inflate the significance of this litigation by suggesting the redevelopment proposal was large and many people voted for Measure C. The lawsuit, however, did not tackle the merits of redevelopment. Nor did it challenge the election's validity. These pitches are balls, not strikes.

There has been no showing that anyone besides the parties does care, or should care, about this case. The claim for fees flunks element two of the test. (*Woodland*, *supra*, 23 Cal.3d at pp. 939–940.)

This case is similar to *Willard v. Kelley* (2015) 238 Cal.App.4th 1049 at pages 1057–1058 (*Willard*), in which the Court of Appeal affirmed the denial of public attorney general fees. Willard filed a petition asserting his political opponent, Woolery, tried to list an incorrect occupation on the ballot. (*Id.* at p. 1051.) Woolery successfully defended the case and sought attorney fees. His defense did not shed light on his views as a candidate and it meant merely that he could continue to designate his preferred occupation on the ballot. (*Id.* at p. 1057.) This resembled " 'mundane squabbles,' " the court ruled. (*Ibid.*, quoting *Hammond v. Agran* (2002) 99 Cal.App.4th 115, 135 (*Hammond*).) The case neither enforced an important public right nor conferred a significant benefit on the general public or a large class of people. (*Willard*, at pp. 1057–1058.)

The Supporters' defense was like *Willard*. It concerned the technical accuracy of Rescue's committee name and campaign forms. The Supporters vindicated their forms as filed. Nothing else happened. This win did not increase the sum of information to the electorate. It shed no light on anyone's views. As in *Willard*, there was no important right and no significant benefit.

The Supporters claim Waterfront's funding meant the lawsuit involved an important right: "Candidates seeking elective office, citizens seeking to limit overdevelopment in their communities and other citizens who oppose or support transparent candidates must be allowed to freely speak publicly about their concerns, without fear of reprisal by those with

20

opposing views and/or a large wallet." And the case conferred a significant public benefit, they argue, because "[c]andidates and citizens must be afforded the opportunity to speak freely about matters which affect their communities, their state, and their country, without fear of reprisal and intimidation by well-financed opponents."

The Supporters' suggestion is that, absent a fee award here, contestants in future elections will mute or censor themselves for fear of monied opponents who, from behind the scenes, will fund retaliatory lawsuits. This factual assertion lacks record support. The claim that a fee award in this case would broadly affect electoral vigor is farfetched. (See also *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1136 [California has no public policy against outside funding of litigation].)

The Supporters say election law litigation inherently implicates public rights, but this claim runs counter to *Travis II*, which held prevailing defendants in election law cases *cannot* be inherently entitled to fees. (*Travis II*, 14 Cal.5th at pp. 422–428.) Caselaw, moreover, shows private attorney general fees are not appropriate in every election law case. The holding in *Willard*, *supra*, 238 Cal.App.4th 1049, proves this point. (See also *Bradley v. Perrodin* (2003) 106 Cal.App.4th 1153, 1165 [denying request for private attorney general fees in election contest case]; *Early v. Becerra* (2021) 60 Cal.App.5th 726, 738 (*Early*) ["not every election contest confers 'a significant benefit to the electorate.' "].)

The Supporters cite three inapposite cases.

*Sandlin v. McLaughlin* (2020) 50 Cal.App.5th 805 (*Sandlin*) does not help the Supporters. Sandlin challenged statements three candidates submitted for the voter pamphlet in

a City of Irvine election.  (*Id.* at pp. 815–817.)  Sandlin wanted to cut parts of the statements, including the candidates' promises that they, if elected, immediately would begin building a veterans' cemetery in a certain location.  (*Id.* at p. 816–817 & fn. 3.)

The candidates successfully defended the challenge, but the trial court denied private attorney general fees, finding no important right and no significant benefit.  (*Sandlin*, *supra*, 50 Cal.App.5th 805 at pp. 829–830.)  The Court of Appeal reversed.  Had Sandlin's petition succeeded, "it would have deprived local voters of critical information about each candidate's views."  (*Id.* at p. 830.)  The candidates enforced their right to communicate about their views to voters and enforced voters' rights to receive this information.  (*Id.* at pp. 830–831.)  This conferred a significant benefit on Irvine voters, who were a large class.  (*Id.* at p. 831; and see *id.* at p. 830, applying *Hammond*, *supra*, 99 Cal.App.4th at p. 121 & fn. 2 [candidate's right to express views in voter pamphlet affects public interest by providing voters with information, and this benefits general voting public].)

Unlike *Sandlin*, this case was not about statements in voter pamphlets.  Neither was it about some other significant communication with the electorate.  Had the Opponents won, their victory would not have prevented the Supporters from sharing their preservationist views.  Voters would have lost no critical information.

*Early*, *supra*, 60 Cal.App.5th also does not help the Supporters.  *Early* was about whether candidate Xavier Becerra earned private attorney general fees for defending his eligibility to run for Attorney General.  Eric Early alleged Becerra did not meet statutory eligibility requirements to be a candidate.  (*Id.* at

p. 731.)  The trial court found for Becerra and awarded him private attorney general fees.  (*Id*. at pp. 731–732.)

The Court of Appeal interpreted the eligibility statute to allow candidates with inactive State Bar licenses and who were not engaged in legal practice to run for Attorney General.  Thus, candidates like Becerra, who voluntarily took inactive status while serving in public office, were eligible.  (*Early*, *supra*, 60 Cal.App.5th at pp. 731–732 & 739.)  This was the first published appellate opinion to interpret this statutory provision.  (*Id*. at p. 739.)

In a separate opinion—the opinion the Supporters cite— the appellate court affirmed the private attorney general fees. (*Early*, *supra*, 60 Cal.App.5th at p. 732.)  As proof Becerra vindicated an important right and conferred a significant public benefit, the court relied in part on its earlier appellate decision. (*Id*. at p. 739.)  The court reasoned that its decision to publish and to announce a rule for the first time showed the significance of the underlying action.  (*Ibid*.)  The court explained its inclusive interpretation of eligibility in the earlier decision had a public benefit for all candidates for Attorney General and for California voters.  (*Id*. at p. 740.)

The Supporters urge us to apply *Early* here to find an important right and public benefit based on the *Travis I* and *Travis II* opinions, but the Supporters ultimately have lost on the pertinent issues in those opinions.  The part of *Travis I* on which they prevailed was the substantial evidence analysis, which was an individualized analysis of the facts of their case.  This victory did not confer a broad public benefit.  As for *Travis II*, it was the Opponents, not the Supporters, who petitioned for review and

who obtained a favorable Supreme Court opinion.  This case is unlike *Early*.

Neither is this case like *Press v. Lucky Stores* (1983) 34 Cal.3d 311.  In that case, store officials prohibited plaintiffs from circulating petitions for a ballot initiative outside a supermarket.  A court granted injunctive relief restraining the store from denying the plaintiffs access to the premises.  (*Id.* at p. 316.)  This litigation enforced important rights of free expression and petition.  While speech and petition rights "are by nature individual rights," enforcing these rights helps secure society's general interests.  (*Id.* at p. 319.)  *Lucky* exemplifies a case protecting free speech.  This case does not.

In sum, the trial court abused its discretion by awarding fees under Code of Civil Procedure section 1021.5.

C

The Opponents request judicial notice of the transcript from the Supreme Court's oral argument in *Travis II*.  We grant this request for judicial notice of a record of a California court.  (See Evid. Code, §§ 452, subd. (d); 459, subd. (a).)

The Supporters request judicial notice of another Commission letter.  We deny the request because the Supporters' motion does not state why the letter is relevant to this appeal.  (See Cal. Rules of Court, rule 8.252.)

**DISPOSITION**

We reverse the award of attorney fees.

As to the earlier proceedings in the Court of Appeal, we repeat our order that Redondo Beach Waterfront, LLC, Bruning, and Wardy shall recover their costs on appeal against Rescue Our Waterfront P.A.C., Brand, Brand for Mayor 2017, Moffat, Craig, and Nehrenheim.

24

In the earlier proceedings in the Court of Appeal, we also ordered that Rescue Our Waterfront P.A.C., Brand, Brand for Mayor 2017, Moffat, Craig, and Nehrenheim shall recover their costs on appeal against Travis and Voisey.  We reverse that part of the order.  Except as to the appellate costs we describe in the paragraph above in favor of Redondo Beach Waterfront, LLC, Bruning, and Wardy in the earlier appellate proceedings, Rescue Our Waterfront P.A.C., Brand, Brand for Mayor 2017, Moffat, Craig, Nehrenheim, Travis, and Voisey shall bear their own costs on appeal.  (See Cal. Rules of Court, rule 8.278.)


                                        WILEY, J.

We concur:


        GRIMES, Acting P. J.



        VIRAMONTES, J.



25